No. 2--07--0322      Filed: 1-11-08

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | | |
|---|---|---|
| NICOLE TORTORIELLO, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 06--L--304 |
| | ) | |
| GERALD NISSAN OF NORTH AURORA, | ) | |
| INC., and J.P. MORGAN CHASE BANK, | ) | Honorable |
| | ) | Judith M. Brawka, |
| Defendants-Appellants. | ) | Judge, Presiding. |

---

JUSTICE O'MALLEY delivered the opinion of the court:

Defendants, Gerald Nissan of North Aurora (Gerald Nissan) and J.P. Morgan Chase Bank (J.P. Morgan), appeal the judgment of the trial court denying their motions to stay court proceedings and compel arbitration pursuant to an arbitration clause in an automobile purchase agreement signed by Gerald Nissan and plaintiff, Nicole Tortoriello. The trial court denied defendants' motions because it found the arbitration clause unconscionable. We view the clause differently and so reverse and remand for further proceedings.

In June 2006, plaintiff sued defendants, seeking to rescind her purchase of a preowned Nissan automobile from Gerald Nissan, a transaction financed by J.P. Morgan. Plaintiff alleged common-law fraud and violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 et seq. (West 2004)). Plaintiff attached to her complaint two documents, each entitled "Used Car Retail Buyers Order" and signed by plaintiff and Gerald Nissan. Both documents

consist of the same two-sided preprinted form but contain different figures in the spaces provided for the contract terms. One document is dated October 22, 2005 (First Buyers Order), and the other October 28, 2005 (Second Buyers Order). Plaintiff alleged that, several days after she signed the First Buyers Order, Gerald Nissan informed her that her financing for the purchase was not approved. According to plaintiff, Gerald Nissan "falsely misrepresented that [she] had no option" but to sign a second contract, the Second Buyers Order, whose terms were less favorable to her than the First Buyers Order.

Both defendants filed motions to stay court proceedings and compel arbitration. They relied on an arbitration clause that appears on the reverse side of the Second Buyers Order. At the top of the reverse side is the heading "Terms and Conditions," followed by a series of single-spaced paragraphs written in very fine print. The density of text is relieved somewhat by a single blank line that separates each paragraph. The paragraphs are numbered and each is prefaced with an underlined subject description. The final paragraph, number 17, contains the arbitration provision. We reproduce it here in actual size and in context, to give an impression of the overall appearance of the page:

"TERMS AND CONDITIONS

1. Changes in Price  Manufacturer has reserved the right to change the price to Dealer of new motor vehicles without notice, in the event the price to Dealer of new vehicles of the series and body type ordered in this contract is changed by the Manufacturer prior to delivery of the new motor vehicle ordered under this contract. Dealer reserves the right to change the cash delivered price of such motor vehicle to Buyer accordingly. If such cash delivered price is increased by Dealer, Buyer may, if dissatisfied with the change in price, cancel this order, in which event the used motor vehicle, if any, that has been traded in as part of the consideration of such new motor vehicle, shall be returned to Buyer upon payment of a reasonable charge for storage and repairs (if any) or, if such used motor vehicle has previously been sold by Dealer, the amount received therefrom, less a selling commission of 15% and any expense incurred in storing, insuring, conditioning, or advertising said used motor vehicle for sale shall be returned to Buyer.

2. Changes in Design  Manufacturer has reserved the right to change the design of any new motor vehicle, chassis, accessories or parts thereof at any time without notice and without obligation to make the same or any similar change upon any motor vehicle chassis, accessory or parts previously purchased by or shipped to Dealer, or being manufactured or sold in accordance with Dealer's orders. In the event of any such change by Manufacturer, Dealer shall have no obligation to Buyer to make the same or similar changes in any motor vehicle, chassis, accessories or parts thereof covered by this contract either before or subsequent to delivery of the new motor vehicle to Buyer.

* * *

15. Severability  If any term, covenant or condition of this contract or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this contract or the application of such term, covenant or provision, to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant or provision of this contract shall be valid and be enforced to the fullest extent permitted by law.

16. Limitation of Dealer's Liability  Dealer's entire liability to Buyer, if any, for any claim, demands or causes of action, whether in tort, contract, consumer fraud, fraud or otherwise, is limited solely to the amount set forth as the purchase price of this contract. Notwithstanding the foregoing limitation, if a dispute, claim or cause of action arises as a result of the purchase of the vehicle or any breach or alleged breach of this contract, whether in tort, contract, consumer fraud, fraud or otherwise, Dealer, at its sole option, may elect to repurchase the vehicle sold hereunder and refund the purchase price of the vehicle to Buyer, less any reasonable costs to Dealer associated with the repurchase. At Dealer's sole discretion, such repurchase would be the sole remedy available to Buyer in the event of a breach of this contract by Dealer. The limitation set forth herein does not affect any disclaimer or other provision of this contract and creates no substantive rights of action against Dealer.

17. Arbitration  Any controversy, claim, cause of action, or other dispute arising out of or relating to this contract, or the breach, termination or invalidity thereof, whether in tort, contract, consumer fraud or otherwise, except a cause of action or claim by Dealer to recover full payment of the purchase price, or claim involving the breach of any retail installment contract

-2-

as set forth below, shall be resolved by binding arbitration before a sole arbitrator in DuPage County, Illinois in accordance with the Commercial Rules of the American Arbitration Association, and judgment upon any award rendered by the arbitrator may be entered in any court of competent jurisdiction. The arbitrator shall determine the rights and obligations of the parties according to the substantive laws of the State of Illinois and the express terms of this contract. The official language of the arbitration shall be English. The arbitrator shall not be empowered to grant exemplary, punitive, or consequential damages or any damages in excess of those damages permitted under the express terms of this contract. The party prevailing on substantially all of its claims shall be entitled to recover its costs, including attorney's fees, for the arbitration proceedings, as well as any ancillary proceeding, including a proceeding to compel or enjoin arbitration, to request interim measures or to confirm or set aside an award. Claims, causes of action and other disputes against Buyer arising out of or related to the breach by Buyer of any retail installment contract executed in connection with this contract are not subject to arbitration under this paragraph."

Enlarged for better readability, the arbitration provision states:

"17. <u>Arbitration</u> Any controversy, claim, cause of action, or other dispute arising out of or relating to this contract, or the breach, termination or invalidity thereof, whether in tort, contract, consumer fraud or otherwise, except a cause of action or claim by Dealer to recover full payment of the purchase price, or claim involving the breach of any retail installment contract as set forth below, shall be resolved by binding arbitration before a sole arbitrator in DuPage County, Illinois in accordance with the Commercial Rules of the American Arbitration Association, and judgment upon any award rendered by the arbitrator may be entered in any court of competent jurisdiction. The arbitrator shall determine the rights and obligations of the parties according to the substantive laws of the State of Illinois and the express terms of this contract. The official language of the arbitration shall be English. The arbitrator shall not be empowered to grant exemplary, punitive, or consequential damages or any damages in excess of those damages permitted under the express terms of this contract. The party prevailing on substantially all of its claims shall be entitled to recover its costs, including attorney's fees, for the arbitration proceedings, as well as any ancillary proceeding, including a proceeding to compel or enjoin arbitration, to request interim measures or to confirm or set aside an award. Claims, causes of action and other disputes against Buyer arising out of or related to the breach by Buyer of any retail installment contract executed in connection with this contract are not subject to arbitration under this paragraph."

Paragraph 16, which is also implicated in this appeal, reads in relevant part:

"16. <u>Limitation of Dealer's Liability</u> Dealer's entire liability to Buyer, if any, for any claim, demands or causes of action, whether in tort, contract, consumer fraud, fraud or otherwise, is limited solely to the amount set forth as the purchase price of this contract."

The top two-thirds of the front side of the Second Buyers Order contains a series of blanks for such terms as the make, model, and year of the purchased car, as well as the selling price, sales tax, and fees. This section of the front side also contains several paragraphs of preprinted terms, including a paragraph entitled "Warranty Disclaimer," which reads in relevant part (not in actual size):

"Dealer expressly disclaims any liability to buyer for any consequential damages, damages for loss of use, loss of profits or income, loss of time or inconvenience, or any other incidental or consequential damages arising out of this contract or the operation of the vehicle purchased hereunder."

The bottom third of the page is set off by a solid line, immediately below which is a heading that is bolded and centered on the page. The heading reads in actual size:

"**SUBJECT TO TERMS & CONDITIONS ON REVERSE SIDE AND THIRD PARTY FINANCE APPROVAL**"

The font for the immediately surrounding lines is considerably smaller and not bolded. The font for the heading is, in fact, the largest on the page but for the main page title, which reads: "USED CAR RETAIL BUYERS ORDER." At the very bottom of the front side of the Second Buyers Order are spaces for the buyer's personal information and signature.

In her response to the motions to compel arbitration, plaintiff argued that the arbitration clause was both procedurally and substantively unconscionable. Plaintiff asserted that she "never saw the [arbitration clause], [she] was not told to read the [clause]," and "no one never [<u>sic</u>] referred to

the [clause]." Plaintiff also argued that the clause was "one-sided, without consideration[,] and inconspicious."

The trial court held a hearing on defendants' motions. Plaintiff testified on her own behalf. She stated that, on October 22, 2005, she purchased a preowned Nissan at Gerald Nissan and traded in her Chevrolet Monte Carlo. The terms of the agreement were contained in the First Buyers Order, which plaintiff signed in the presence of a financing employee whom she did not name. Plaintiff testified that she had no objection to the terms of the First Buyers Order as she understood them. Plaintiff acknowledged that the reverse side of the First Buyers Order contains an arbitration clause identical to the provision in the Second Buyers Order. Plaintiff testified that when she signed it she was unaware of the arbitration clause in the First Buyers Order. Plaintiff explained that no one at Gerald Nissan advised her to read the back of the document or informed her that there were any terms on the back. Plaintiff did not read the back of the First Buyers Order on her own initiative before she signed the contract, because she "didn't get an opportunity." Plaintiff testified that Gerald Nissan gave her copies of the First Buyers Order and the related paperwork she signed on October 22. When asked if she read the back of the First Buyers Order between October 22 and October 28, the day she returned to Gerald Nissan, plaintiff said: "Everything was a done deal at that point, so I didn't feel that I had to sit down and analyze the contracts that were already provided to me the first time."

Plaintiff testified that, on October 26, 2005, she received a phone call from Tamer Shams, Gerald Nissan's finance manager. In that conversation, Shams asked plaintiff to return to Gerald Nissan to discuss "two options" with him. Shams also stated that plaintiff needed to re-sign her paperwork. When plaintiff told Shams that she did not wish to sign any more paperwork, Shams

replied that she was required "by law" to do so and that her credit could be negatively affected if she refused.

Plaintiff testified that she went to Gerald Nissan on October 28 and met with Shams, who presented plaintiff with the Second Buyers Order. Plaintiff testified that Shams said nothing about her financing for the sale reflected in the First Buyers Order and that he did not allude to any problem with the transaction. Plaintiff noticed that the Second Buyers Order reflected the purchase of the same preowned Nissan shown in the First Buyers Order but indicated an increase of $1,700 for her service contract. Plaintiff told Shams that she did not want to sign the Second Buyers Order and asked that Gerald Nissan return her trade-in. Shams refused and said that Gerald Nissan would sue plaintiff if she did not sign the document. Plaintiff, believing that she had "no option to walk away," signed the Second Buyers Order and the related paperwork. Plaintiff testified that neither Shams nor anyone else at Gerald Nissan informed her that day of an arbitration clause in the Second Buyers Order. Plaintiff did not read the back of Second Buyers Order on her own initiative before she signed it, because she was "rushed" through the process. Plaintiff admitted, however, that she never requested time to read the contract in full before she signed it. She also did not read the back of the Second Buyers Order before leaving Gerald Nissan that day, because the document was "taken away as soon as she signed [it]." Plaintiff testified that she was given a copy of the signed Second Buyers Order when she left Gerald Nissan that day. When asked if she had "read anything on the reverse side since then," plaintiff replied in the negative.

Plaintiff testified that she signed the Second Buyers Order involuntarily and under "duress." She testified that no one at Gerald Nissan physically threatened her but that she signed the Second Buyers Order to preserve her credit, which Shams claimed would be damaged if she did not sign the

agreement. Plaintiff admitted that she never asked to speak to anyone other than Shams at Gerald Nissan on October 28.

Shams was defendants' sole witness. He testified that the transaction reflected in the First Buyers Order failed because plaintiff's financing was rejected. Shams explained that "there is a certain advance you would need from the bank to get the deal approved" and that plaintiff's advance "was coming up short" because she owed more on her trade-in, the Monte Carlo, than the car was worth. Shams testified that he later secured financing for plaintiff from J.P. Morgan. Shams acknowledged that the "deal had changed" but he did not elaborate. Shams testified that, once he obtained financing, he phoned plaintiff and said: "[T]here is some paperwork that I need to go over with you and *** I need you to come in and re-sign some paperwork." Plaintiff met with Shams at Gerald Nissan and told him she desired a car with a sunroof, which was lacking in the Nissan she had originally agreed to purchase. After Shams showed her a model with a sunroof, plaintiff decided to purchase the Nissan she had earlier selected. Plaintiff then signed the Second Buyers Order and the related paperwork. Shams testified that plaintiff did not "ask [for] more time to read the documents." Shams testified that plaintiff "could have decided not to purchase any cars from [Gerald Nissan]" but that she never expressed such a desire to Shams.

The trial court issued a written order denying defendants' motions to stay proceedings and compel arbitration. The trial court found the arbitration clause both procedurally and substantively unconscionable based on the following factors, no single one of which, the trial court cautioned, was dispositive:

"a. the arbitration provision in Section 17 is not conspicuous when the document is viewed as a whole, nor on the back page;

b. the arbitration provision in Section 17 is indistinguishable in the fine print but for the title;

c. the arbitration provision in Section 17 is not specifically referenced or referred to on the front page;

d. the arbitration provision in Section 17 is not the result of a prior course of meaningful dealings or trade usage between the parties;

e. the arbitration provision in Section 17 was not bargained for between the parties but rather is one provision in a contract of adhesion where there existed a disparity of bargaining power between the drafter of the contract and the party claiming unconscionability;

f. the arbitration provision in Section 17 was not brought specifically to the plaintiff purchaser's attention;

g. the arbitration provision in Section 17 is at the bottom of a full page of fine print filled from margin to margin with text;

h. the arbitration provision in Section 17 is written in 'legalese' without clear notice to the purchaser that dispute resolution is significantly limited (e.g. the first sentence of the section is as long or longer than eight of the other sixteen paragraphs, and is so complicated, it is nearly unintelligible);

i. the one-sided nature of the issues to be arbitrated in Section 17 excludes all matters dealing with the purchaser's financial obligations irrespective of other findings regarding the dealer by the arbitrator;

j. the inclusion of a provision within Section 17 in violation of the Illinois Consumer Fraud Act excluding any consideration of punitive damages."

Immediately following these findings, the trial court noted in parentheses: "contrast: the arbitration section at issue in [Kinkel v. Cingular Wireless LLC, 223 Ill. 2d 1 (2006)]." The trial court concluded that plaintiff "cannot be fairly said to have been aware of what she was agreeing to in Section 17 which is inordinately one-sided in the drafter's favor." Defendants filed this timely appeal under Supreme Court Rule 307(a)(1). 188 Ill. 2d R. 307(a)(1).

## I. PLAINTIFF'S MOTION TO STRIKE

Before we consider the merits of this appeal, we address plaintiff's motion to strike portions of defendants' opening brief. Plaintiff takes issue with three aspects of defendants' statement of facts. First, plaintiff asserts that defendants' citations that appear in the form, "RP Plaintiff's [or Defendant's] Ex. __," are improper because the source "simply can not [sic] be located." The point of this objection eludes us. "RP," as defendants explain, quite obviously designates the report of proceedings for the hearing on defendants' motions to compel arbitration, the only proceeding transcribed in the record. It is equally apparent that the designation "Ex." refers to an exhibit admitted at that hearing. These citations are entirely appropriate. Second, plaintiff argues that defendants' quotation of the arbitration provision, bolded in part unlike the original, "make[s] it appear as if the arbitration provisions were conspicuous and easily found." Defendants bolded the essential parts of the arbitration provision for emphasis. We do not reproach them for this. We can properly assess the conspicuousness of the arbitration clause from the copy of the Second Buyers Order that is included in the record.

Plaintiff's third complaint with defendants' statement of facts is that defendants have misrepresented the record. Plaintiff singles out the following statements from page 10 of defendants' brief:

"Plaintiff claims that she never read [the arbitration] clause before signing either Agreement. (RP 000066, RP 000119-20). She did not, in fact, choose to read anything on the reverse side of the Agreements. (*Id.*)"

The relevant testimony on the pages defendants cite is:

"Q. Did you, at the time you were at the dealership on the 28th [of October 2005], read anything on the reverse side of that document [the Second Buyers Order]?

A. No. At the time.

Q. Now, if you'll flip to the second page, obviously, this is a photo copy, but--well, first of all, have you read anything on the reverse side since then?

A. No.

\* \* \*

Q. You read the front of every document that you were handed on October 22nd and October 28th?

A. On the 28th, I did not. On the 22nd, the documents that were provided in front of me, I read the front. They took them after I signed, so the 22nd was a car I actually wanted. I mean, I wanted that deal. I signed for it, so I read the front of it, didn't get an opportunity to read the back part."

Plaintiff claims that defendants' statement that she "did not, in fact, choose to read anything on the reverse side of the Agreements" (emphasis added) misrepresents the actual meaning of the testimony. While plaintiff's testimony implies that she freely chose not to read the back side of either Buyers Order after she signed it, she expressly testified that she "didn't get an opportunity to read the back part" of the First Buyers Order before she signed it on October 22 and that she was "rushed" through

the process on October 28 and so she also did not read the reverse side of the Second Buyers Order before signing it. If the above-quoted statements from defendants suggest that plaintiff freely chose not to read the reverse side of either Buyers Order before signing it, then their claims do not accurately reflect the record. In our view, however, defendants' assertion that plaintiff "did not, in fact, choose to read anything on the reverse side of the Agreements" is ambiguous and may refer to plaintiff's conduct before or after she signed each Buyers Order. While we believe that defendants should have clarified their statements, the record does not clearly confute them, and we refuse to strike them.

Plaintiff also takes issue with the argument section of defendants' opening brief. She asks that we strike all citations to federal district court decisions as well as the arguments based on those citations. Plaintiff cites admonitions from the Seventh Circuit Court of Appeals as to the precedential value of federal district court cases. Plaintiff claims that these cases hold that the decisions of the lower federal courts "are not to be cited for any purpose." (Emphasis added.) This is an indefensible overstatement. For instance, Anderson v. Romero, 72 F.3d 518, 525 (7th Cir.1995), states that "[d]istrict court decisions have no weight as precedents" and "no authority" but may be cited as "evidence of the state of the law." Plaintiff's argument has a more fundamental affliction, however. On the question of what is proper practice in state courts, she cites prescriptions by federal appellate courts for practice in federal courts. She claims that these federal prescriptions also bind state court practice by virtue of the federal supremacy clause (U.S. Const., art. VI), but the sole case she cites, Weiss v. Village of Downers Grove, 225 Ill. App. 3d 466 (1992), speaks to the entirely distinct question of what substantive law--state or federal--governs federal claims brought in state courts. See Weiss, 225 Ill. App. 3d at 469 ("Where, as here, a State court considers a Federal claim under

the supremacy clause of the United States Constitution (U.S. Const., art. VI), the State court must apply Federal law to the claim").  The more relevant guidepost is our recent statement in Lamar Whiteco Outdoor Corp. v. City of West Chicago, 355 Ill. App. 3d 352, 360 (2005), that "[a]lthough this court is not bound to follow federal district court decisions [citation], such decisions can provide guidance and serve as persuasive authority [citation]."  Defendants' citation to federal district courts is not improper per se.  We will give these authorities no greater deference than they are due.

For the reasons stated above, we deny plaintiff's motion to strike portions of defendants' brief.

## II.  UNCONSCIONABILITY

We now turn to the substance of this appeal.  Defendants attack the trial court's finding that the arbitration clause in the Second Buyers Order is both procedurally and substantively unconscionable.

The threshold question is what law applies.  There are two contenders: section 1 of the Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/1 (West 2004) ("[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such  grounds as exist for the revocation of any contract")) and section 2 of the Federal Arbitration Act (FAA) (9 U.S.C. §2 (2000) ("[a] written provision in *** a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract")).  Defendants argue that the FAA applies because the

underlying transaction in this case affects interstate commerce. Normally, "[w]here a contract involving interstate commerce contains an arbitration clause, federal law preempts state statutes even in state courts." Bishop v. We Care Hair Development Corp., 316 Ill. App. 3d 1182, 1190 (2000). However, "in circumstances where parties to a contract have agreed to arbitrate in accordance with state law, the FAA does not apply, even where interstate commerce is involved." Glazer's Distributors of Illinois, Inc. v. NWS-Illinois, LLC, 376 Ill. App. 3d 411, 421 (2007); see also Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University, 489 U.S. 468, 479, 103 L. Ed. 2d 488, 500, 109 S. Ct. 1248, 1256 (1989) ("Just as [the parties] may limit by contract the issues which they will arbitrate [citation], so too may they specify by contract the rules under which that arbitration will be conducted. Where *** the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA ***"). The Second Buyers Order provides that it "shall be governed by the internal laws of the State of Illinois," and the arbitration provision states that "[t]he arbitrator shall determine the rights and obligations according to the substantive laws of the State of Illinois." Pursuant to Glazer's and Volt, we apply the Arbitration Act to the arbitration provision.

In fact, we would apply Illinois law even absent the choice-of-law provision. Neither party presented the trial court with the question of what law should apply. The trial court's order denying defendants' motions does not refer at all to the FAA and cites the Arbitration Act alone. It is not our province to decide for the first time in this litigation whether the FAA applies, for whether a transaction impacts interstate commerce is a question of fact. See Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Comm'n, 387 F.2d 768, 772 (3d Cir. 1967) ("it is impossible for us to determine on appeal whether the [FAA] applies. For to do so would require us to make an initial

factual determination whether the contract evidenced 'a transaction involving commerce' within the meaning of §2 of the Act"); see also Else v. Inflight Cinema International, Inc., 465 F. Supp. 1239, 1244 (D.C. Pa. 1979) ("[w]hether interstate commerce is involved is a question of fact for the district court").

No matter which statute we apply, however, Illinois law will govern our analysis. "Whether under federal rules or state law, there is no arbitration without a valid contract to arbitrate." Aste v. Metropolitan Life Insurance Co., 312 Ill. App. 3d 972, 975 (2000). " 'In determining whether a valid arbitration agreement arose between the parties, [the court] should look to the state law that ordinarily governs the formation of contracts.' " Aste, 312 Ill. App. 3d at 976, quoting Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1130 (7th Cir. 1997). In applying the FAA, "courts may not *** invalidate arbitration agreements under state laws applicable only to arbitration provisions" (emphasis in original) (Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 134 L. Ed. 2d 902, 909, 116 S. Ct. 1652, 1656 (1996)), but "general contract defenses such as fraud, duress, or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements" (Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 892 (9th Cir. 2002)). Even if the FAA applied, Illinois law would provide the ultimate criteria for judging plaintiff's claims of unconscionability.

Having determined that Illinois law applies, we turn to the question of who--the trial court or the arbitrator--should decide the validity of the arbitration clause. Defendants argue that the trial court should have referred to the arbitrator the question of whether the arbitration clause's disclaimer of punitive damages conforms with the Consumer Fraud Act. As noted, the trial court invalidated the arbitration clause for, inter alia, its nonconformity with the Consumer Fraud Act. (Defendants

do not dispute that the trial court was the appropriate arbiter for the remaining issues touched on by the court in its disposition.) Defendants advance two contentions why the arbitrator, not the trial court, should have decided whether the disclaimer of punitive damages is consistent with the Consumer Fraud Act. First, defendants assert that the trial court's consideration of that particular challenge to the arbitration clause violated the principle that the court "is not to consider the merits of the arbitrable issue but must summarily determine whether an arbitration agreement exists" (Contract Development Corp. v. Beck, 210 Ill. App. 3d 677, 679 (1991)). Defendants fail to recognize that, though plaintiff's complaint alleges violations of the Consumer Fraud Act, the disclaimer of punitive damages is not one of the grounds alleged. Thus, the legitimacy of the damages limitation is not an "arbitrable issue" but a basis on which plaintiff attacks the arbitration clause itself. "The issue of whether a contract to arbitrate exists must be determined by the court, not an arbitrator." Bahuriak v. Bill Kay Chrysler Plymouth, Inc., 337 Ill. App. 3d 714, 719 (2003); see also 710 ILCS 5/2(b) (West 2004) ("[o]n application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate" (emphasis added)). Second, defendants cite Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 163 L. Ed. 2d 1038, 126 S. Ct. 1204 (2006), which, in their words,"held specifically that the question of whether a [sic] terms of a contract with an arbitration [clause] rendered the contract void for illegality was to be determined by an arbitrator, not the court." Defendants overlook an important qualification in Buckeye's holding. The court held that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." (Emphasis added.) Buckeye, 546 U.S. at 445-46, 163 L. Ed. 2d at 1044, 126 S. Ct. at 1209. In any event, Buckeye was interpreting the FAA, which divides responsibilities between the arbitrator and the trial court

-15-

differently than does the Arbitration Act, which is the applicable statute here. Under the Arbitration Act, "[t]he issue of whether a contract to arbitrate exists must be determined by the court, not an arbitrator" (Bahuriak, 337 Ill. App. 3d at 719), regardless of whether the challenge to the arbitration clause is in effect a challenge to the entire contract (which, incidentally, could be the case here because the contract contains a general disclaimer of punitive damages). The trial court was correct in taking upon itself the issue of whether the disclaimer of punitive damages in the arbitration clause comports with the Consumer Fraud Act. In what follows, we review the trial court's findings on that issue and on the other facets of plaintiff's claim that the arbitration clause is invalid as unconscionable.

Before examining the arbitration clause, we set forth our standard of review. While deferring to the trial court's findings of fact supporting its determination of unconscionability (Caliguiri v. First Colony Life Insurance Co., 318 Ill. App. 3d 793, 800-01 (2000)), we review de novo both its construction of the arbitration clause (Peach v. CIM Insurance Corp., 352 Ill. App. 3d 691, 694 (2004)) and its ultimate determination of unconscionability (Kinkel, 223 Ill. 2d at 22). There is a "strong public policy in favor of enforcing arbitration agreements." Kinkel, 223 Ill. 2d at 47.

"Unconscionability can be either 'procedural' or 'substantive' or a combination of both." Razor v. Hyundai Motor America, 222 Ill. 2d 75, 99 (2006). The trial court determined that the arbitration provision was unconscionable in both senses.

A. Procedural Unconscionability

We attend first to the finding of procedural unconscionability. Recently, in Kinkel, the supreme court adopted a lengthy exposition of procedural unconscionability from the First District Appellate Court in Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co., 86 Ill. App. 3d 980, 989-90 (1980). The issue in Frank's Maintenance was the procedural and substantive fairness of a

limitation on liability, but the supreme court in Kinkel held that the following remarks were applicable as well to an attack on an arbitration provision:

" 'Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of meaningful choice. [Citations.] Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability. [Citation.] To be a part of the bargain, a provision limiting the defendant's liability must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, brought to the purchaser's attention or be conspicuous.' " Kinkel, 223 Ill. 2d at 23, quoting Frank's Maintenance, 86 Ill. App. 3d at 989-90.

Most of the trial court's findings relate to procedural unconscionability. The trial court found that the arbitration provision is "indistinguishable in the fine print but for the title" and so is not conspicuous, was "not specifically referenced or referred to on the front page," was "not brought specifically to the plaintiff purchaser's attention," was "not the result of a prior course of meaningful dealings or trade usage between the parties," was "not bargained for" but rather was part of a contract of adhesion, and was written in "legalese" and so was "nearly unintelligible." Plaintiff also claims that she was "coerced" into signing the Second Buyers Order. This is a reference, we presume, to alleged remarks by Shams that negative consequences, such as damage to plaintiff's credit or even a lawsuit by Gerald Nissan, would flow from her refusal to sign the document. The trial court, however, made

no finding that plaintiff was subject to coercion or duress beyond what was inherent in the Second Buyers Order, which, as we explain below, is a contract of adhesion. See, e.g., Kinkel, 223 Ill. 2d at 26 (noting that the typical contract of adhesion contains "terms *** [that] are nonnegotiable and presented in fine print in language that the average consumer might not fully understand"). Therefore, we do not consider whether plaintiff was coerced by threats into signing the Second Buyers Order.

The trial court's findings on procedural unconscionability relate to either of two questions: (1) whether plaintiff could or did notice the clause, i.e., whether the clause was "part of the bargain," in the words of Frank's Maintenance; and (2) whether plaintiff could or did understand the clause.

Our discussion of the first question is framed by the final line in the above-quoted language from Frank's Maintenance: "To be a part of the bargain, [an arbitration provision] must, unless incorporated into the contract through a prior course of dealing or trade usage, have been bargained for, brought to the purchaser's attention or be conspicuous." (Emphasis added.) Frank's Maintenance, 86 Ill. App. 3d at 990. The trial court found, and defendants do not dispute, that the arbitration provision was neither bargained for nor incorporated into the Second Buyer's Order through a prior course of dealing or trade usage. The clause quoted from Frank's Maintenance is, however, in the disjunctive, conveying that an arbitration provision may be considered "part of the bargain" if it has at least one of the characteristics the court listed. Defendants argue that the arbitration provision has the saving virtue of being conspicuous. We find that, though the arbitration clause itself was not conspicuous, it was adequately brought to plaintiff's attention by another provision in the contract and, therefore, was part of the bargain.

To explain our holding, we focus on two discrete findings by the trial court. The first is the finding that the arbitration clause is not conspicuous because it is "indistinguishable in fine print but

for the title" and is "at the bottom of a full page of fine print filled margin to margin with text." The second is the court's finding that the clause "was not brought specifically to the plaintiff purchaser's attention" and "is not specifically referenced or referred to on the front page." We review both findings de novo because they are based on the trial court's interpretation of the Second Buyers Order. See Peach, 352 Ill. App. 3d at 694. The court remarked, without elaboration, that the arbitration clause compared unfavorably with the provision in Kinkel, which the supreme court held was procedurally unconscionable to a "degree" but not enough to invalidate it independently of any substantive flaws (Kinkel, 223 Ill. 2d at 27). As Kinkel was central to the trial court's decision, and plaintiff cites it in defending the trial court's reasoning, we examine the case in detail. As we explain below, Kinkel demonstrates that an arbitration clause that is not itself conspicuous may be deemed part of the bargain under Frank's Maintenance if it was brought to the consumer's attention by other provisions in the contract of which the clause is a part.

At issue in Kinkel was the validity of an arbitration clause in the plaintiff's contract with Cingular for cellular telephone service. The arbitration clause appeared on the reverse side of the contract in a densely printed series of paragraphs with the general heading " 'TERMS AND CONDITIONS.' " Kinkel v. Cingular Wireless, LLC, 357 Ill. App. 3d 556, 558 (2005). The following provision was nestled in the middle of a paragraph near the bottom of that page:

" '**INDEPENDENT ARBITRATION**[.] Please read this paragraph carefully. It affects rights that you may otherwise have. (a) CINGULAR and you shall use our best efforts to settle any dispute or claim arising from or relating to this Agreement. *** If CINGULAR and you do not reach agreement within 30 days, instead of suing in court, CINGULAR and you agree to arbitrate any and all disputes and claims (including but not limited to claims

-19-

based on or arising from an alleged tort) arising out of or relating to this Agreement, or to any prior Agreement for products or service between you and CINGULAR \*\*\*. \*\*\* Except where prohibited by law, CINGULAR and you agree that no arbitrator has the authority to[] (1) award relief in excess of what this agreement provides[,] (2) award punitive damages or any other damages not measured by the prevailing party's actual damages[,] or (3) <u>order consolidation or class arbitration</u>. The Arbitrator(s) must give effect to the limitations on CINGULAR's liability as set forth in this agreement, any applicable tariff, law, or regulation. \*\*\* Notwithstanding the foregoing, either party may bring an action in small claims court.' " (Emphasis added.) <u>Kinkel</u>, 357 Ill. App. 3d at 558.

Near the top of the page was this statement:

" 'IMPORTANT NOTICE: THIS AGREEMENT CONTAINS MANDATORY ARBITRATION AND OTHER IMPORTANT PROVISIONS LIMITING THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE. PLEASE REFER TO THE SECTION ENTITLED 'ARBITRATION' FOR DETAILS.' " <u>Kinkel</u>, 357 Ill. App. 3d at 563-64.

The appellate court in <u>Kinkel</u> included a copy of the "Terms and Conditions" page in its appendix, but neither the copy nor the court's quotations from the original document are in actual size. The appellate court endeavored to describe the text:

"[The arbitration clause] appears in the middle of a long paragraph at the bottom of the terms-and-conditions page on the back of the service agreement. The arbitration clause is one of five clauses appearing in the same paragraph. The terms and conditions are printed on an 8-by 14-inch page containing 123 lines of tiny single-spaced text. By way of comparison, an

8- by 14-inch page contains 61 lines of 12-point single-spaced type." Kinkel, 357 Ill. App. 3d at 563.

The plaintiff in Kinkel challenged the arbitration clause as a whole, and the class action waiver in particular, arguing unconscionability. Presumably because it was undisputed that the arbitration clause was neither specifically bargained for nor incorporated into the service agreement through a prior course of dealing or trade usage, the appellate court's discussion of procedural unconscionability focused solely on whether the challenged provisions were brought to the plaintiff's attention or were conspicuous. The court held: (1) the arbitration clause as a whole was not conspicuous but was brought to the plaintiff's attention, and (2) the class action waiver was neither. Kinkel, 357 Ill. App. 3d at 563-64.

As for the arbitration clause as a whole, the court found that it "could not be less conspicuous," because "[t]he print is so small that it seems highly unlikely that any consumer would read the entire terms-and-conditions page." Kinkel, 357 Ill. App. 3d at 563. The court acknowledged the bolded and all-capitalized signal, "Independent Arbitration," but found that it provided "far less visual emphasis than might be the case with larger print." Kinkel, 357 Ill. App. 3d at 563. The court also took note of the all-capitalized proviso that warned of "Mandatory Arbitration," but it determined that "due to the minuscule typeface, the capital letters provide far less emphasis than they otherwise might." Kinkel, 357 Ill. App. 3d at 563-64. The court found the warning of "Mandatory Arbitration" "sufficient to warrant a conclusion that the arbitration provision as a whole was conspicuous or brought to the plaintiff's attention." (Emphasis added.) Kinkel, 357 Ill. App. 3d at 563-64. However, the warning "[did] nothing to bring the provision barring class arbitration to [the plaintiff's] attention." Kinkel, 357 Ill. App. 3d at 564. The court concluded:

"The [class action waiver] was offered to the plaintiff on a take-it-or-leave-it basis hidden in a maze of fine print where it was unlikely to be noticed, much less read. This is sufficient for a finding of procedural unconscionability." Kinkel, 357 Ill. App. 3d at 564.

Cingular appealed to the supreme court the finding on the class action waiver. The plaintiff did not appeal the appellate court's rejection of her challenge to the arbitration clause as a whole. In analyzing the issue of procedural unconscionability, the supreme court mentioned an aspect of the service contract that the appellate court, curiously, did not acknowledge. On the front of the contract, the plaintiff had initialed a preprinted acknowledgment that she had read the terms and conditions on the back. Kinkel, 223 Ill. 2d at 26.

The supreme court did not dispute the appellate court's assessment that the class action waiver was "hidden in a maze of fine print where it was unlikely to be noticed, much less read" (Kinkel, 357 Ill. App. 3d at 564). The court found the inconspicuousness of the clause itself offset by two points: (1) the plaintiff's signed acknowledgment on the front of the contract that she had read the terms and conditions on the back; and (2) the undisputed fact that "the terms and conditions were in [the plaintiff's] possession and she either read them or could have read them if she had chosen to do so." Kinkel, 223 Ill. 2d at 26.

The court recognized that the service contract was a contract of adhesion, typified by terms that are "nonnegotiable and presented in fine print in language that the average consumer might not fully understand." Kinkel, 223 Ill. 2d at 26. The arbitration clause could not be invalid on these grounds alone, stressed the court, because "[s]uch contracts *** are a fact of modern life." Kinkel, 223 Ill. 2d at 26. The court explained:

"Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services. It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable." Kinkel, 223 Ill. 2d at 26.

The court discussed two cases cited by the plaintiff: Razor and Frank's Maintenance. The plaintiffs in Razor and Frank's Maintenance challenged waivers of consequential damages, not arbitration clauses, but the Kinkel court found their analyses relevant nonetheless. The court concluded that the cases were "largely distinguishable." Kinkel, 223 Ill. 2d at 26. The court noted that the disputed provision in Frank's Maintenance, like that in Kinkel, appeared on the reverse side of a sales document. The difference was that, in Frank's Maintenance, "[the] clause directing the plaintiff's attention to the conditions printed on the reverse was stamped over, suggesting that the obscured language was irrelevant and could be ignored." Kinkel, 223 Ill. 2d at 25. The front-page advisory in Kinkel was unobstructed.

The court did find a similarity between the arbitration clause and the waiver of consequential damages in Razor. The clause stated that arbitration costs were to be set by the Wireless Industry Arbitration Rules, which were available from Cingular or the American Arbitration Association " 'upon request.' " Kinkel, 223 Ill. 2d at 8. This statement "was in fine print near the bottom of an 8- by 14-inch page that was filled, from margin to margin, with text," and it was not emphasized in any way. Kinkel, 223 Ill. 2d at 26-27. The Kinkel court found parallels between this "lack of information" and the facts of Razor, where the plaintiff first encountered the waiver of consequential damages in the owner's manual delivered with the car, and thus there was " '[no] basis for concluding that plaintiff could have seen the clause[] before entering into the sales contract.' " Kinkel, 223 Ill. 2d

at 25, quoting Razor, 222 Ill. 2d at 102. Even though the plaintiff in Kinkel did not challenge the cost provision of the arbitration clause, the court held that that issue could not be answered "without viewing the waiver provision in the context of the service agreement as a whole." Kinkel, 223 Ill. 2d at 22. The court concluded that, though there was "a degree of procedural unconscionability" in "the contract of which the class action waiver [was] a part," the taint was not sufficient by itself to invalidate the contract, and the court proceeded to address the plaintiff's claims of substantive unconscionability. Kinkel, 223 Ill. 2d at 27.

The supreme court's opinion in Kinkel teaches three lessons pertinent to the case at hand. First, contracts of adhesion, typified by terms that are "nonnegotiable and presented in fine print in language that the average consumer might not fully understand" (Kinkel, 223 Ill. 2d at 26), are not per se unconscionable from a procedural standpoint. Some added coercion or overreaching is necessary.

Second, Kinkel teaches that even an arbitration clause "hidden in a maze of fine print where it [is] unlikely to be noticed, much less read" (Kinkel, 357 Ill. App. 3d at 564) may be considered "part of the bargain" if it was brought to the consumer's attention elsewhere in the contract. This norm follows from the disjunctive proposition of Frank's Maintenance, adopted by Kinkel, that " '[t]o be part of the bargain, [an arbitration clause] must, unless incorporated into the contract through prior course of dealings or trade usage, have been bargained for, brought to the purchaser's attention or be conspicuous.' " (Emphasis added.) Kinkel, 223 Ill. 2d at 23, quoting Frank's Maintenance, 86 Ill. App. 3d at 990.

Third, the procedural soundness of any particular provision within an arbitration clause is assessed by considering "the [contract] as a whole." Kinkel, 223 Ill. 2d at 22. When Kinkel reached

the supreme court, the plaintiff challenged only the class action waiver in the arbitration clause, but the court also took note of infirmities in the cost provision of the clause. Kinkel, 223 Ill. 2d at 26-27. Here, plaintiff challenges the arbitration clause as a whole, and our attention has not been directed to an alleged procedural flaw in any other provision in the Second Buyers Order.

In light of Kinkel, the arbitration clause is not invalid as procedurally unconscionable. First, the clause was "part of the bargain." Like the class action waiver in Kinkel, the arbitration clause, ensconced in one of several paragraphs in a page of densely packed, minute print, was not conspicuous by any reasonable measure. Yet, also like the class action waiver in Kinkel, the arbitration clause was brought to the reader's attention by a notice elsewhere in the contract. The signaling provision was the bolded, all-capitalized statement, "**SUBJECT TO TERMS & CONDITIONS ON REVERSE SIDE AND THIRD PARTY FINANCE APPROVAL**," printed above the signature lines on the front side of the Second Buyers Order. Of course, unlike in Kinkel, plaintiff did not sign or initial a separate acknowledgment that she had read the conditions on the reverse side of the contract, nor was there a prominent and specific notice of mandatory arbitration on the reverse side of the contract. This lack was offset, we believe, by a fact that was absent in Kinkel. Although plaintiff did not have an opportunity to read the back side of the Second Buyers Order at Gerald Nissan on October 28, 2005, its preprinted terms had been in her possession for several days, because the forms for the First and Second Buyers Orders were identical. Plaintiff signed the First Buyers Order on October 22, 2005. She testified that she was content with the terms of that agreement as she understood them. Plaintiff had several days to review the First Buyers Order before returning to Gerald Nissan on October 28 and signing a contract that contained identical terms preprinted in an identical format. The supreme court in Kinkel found it significant that "the terms and

conditions were in [the plaintiff's] possession and she either read them or could have read them if she had chosen to do so." Kinkel, 223 Ill. 2d at 26. Plaintiff had even more opportunity to read the arbitration provision than did the plaintiff in Kinkel, who by all appearances agreed to the terms the same day she was presented them. Plaintiff, we hold, cannot reasonably claim that she had insufficient notice of the arbitration clause in the Second Buyers Order. See Bunge Corp. v. Williams, 45 Ill. App. 3d 359, 364 (1977) (the defendants' claim that they had no opportunity to read the arbitration provisions in their contracts to sell grain to the plaintiff was "to no avail" because "each defendant had been a party to a contract to sell grain to [the plaintiff] on at least one prior occasion, and *** those contracts had been made on identical forms containing identical arbitration provisions").

Relatedly, we note that the "disparity of bargaining power" identified by the trial court is not fatal to the arbitration clause. Such disparity, the supreme court noted in Kinkel, is typical of contracts of adhesion, which are not per se unconscionable.

Second, on the separate question of whether plaintiff could or did understand the arbitration clause, we find that the arbitration clause is not abstruse to the point of invalidity. Like the trial court's finding of a disparity of bargaining power, its finding that the arbitration clause was "nearly unintelligible" because of its "legalese" does not distinguish the document from the general run of contracts of adhesion. Such contracts are known for having "language that the average consumer might not fully understand" (Kinkel, 223 Ill. 2d at 26). The trial court placed particular emphasis on the abstruseness of the clause, but its lack of clarity is not unusual for legal contracts, which are seldom extolled for limpid prose.

Besides Kinkel, plaintiff cites Frank's Maintenance, Razor, Bahuriak, and Anderson v. Farmers Hybrid Cos., 87 Ill. App. 3d 493 (1980). These four cases are readily distinguishable. Frank's

Maintenance is distinguishable here for the same reason it was in Kinkel, namely, the front-page advisory in Frank's Maintenance was effaced and thus appeared "irrelevant" (Frank's Maintenance, 86 Ill. App. 3d at 992). In Razor, the plaintiff first encountered the waiver of consequential damages in the owner's manual of the car she had already purchased. The court said:

"Surely, whatever other context there might be in which a contractual provision would be found to be procedurally unconscionable, that label must apply to a situation such as the case at bar where plaintiff has testified that she never saw the clause; nor is there any basis for concluding that plaintiff could have seen the clause, before entering into the sales contract." (Emphasis in original.) Razor, 222 Ill. 2d at 101-02.

There is no question here that plaintiff was presented with the arbitration clause before she signed the Second Buyers Order. Razor, therefore, has no weight in the circumstances of this case.

In Anderson, 87 Ill. App. 3d at 501, the appellate court held that a damages limitation appearing on the reverse side of an order-confirmation slip was not conspicuous and thus did not comply with section 2--316(2) of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1971, ch. 26, par. 2--316(2) (now 810 ILCS 5/2--316(2) (West 2004))). The code provides: "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Ill. Rev. Stat. 1971, ch. 26, par. 1--201(10) (now 810 ILCS 5/1--201(10) (West 2004)). The court reasoned that, though the clause was in capital letters, there was little on the front side of the slip to suggest that there were any conditions on the back:

"In small print, in the middle of the slip, was the following sentence: 'This order subject to conditions on reverse side hereof and subject to acceptance by the company.' This language was not conspicuous in any manner and, in fact, was in smaller print than other on the front

side of the order slip. *** We find little on the front side, under the circumstances, to bring to a reasonable person's attention and notice the existence of express disclaimers on the reverse side of the slip. *** In short, while the type used for disclaiming the warranties was conspicuous, in the sense of being larger than other type in the paragraph, the presence of that paragraph on the reverse side of the order slip was not at all conspicuous, either from the general appearance of the slip or from any conspicuous language on the front side of the slip." Anderson, 87 Ill. App. 3d at 502.

Anderson's guidance is severely limited because the reader cannot appreciate the size of the relevant writing in the case. The court's characterization of the front-page proviso as written in "small print" is not particularly illuminating, and the court did not append a copy of the slip to its opinion or attempt to reproduce the text in actual size. We think that, by any reasonable scale, the proviso on the front side of the Second Buyers Order is not in "small print." Anderson, we conclude, is no help to plaintiff.

Plaintiff's citation to Bahuriak is a curiosity, as no claim of unconscionability was raised in that case. In fact, the appellate court held that the trial court's findings as to the existence of a valid arbitration agreement were insufficient for review and remanded for further findings. Bahuriak, 337 Ill. App. 3d at 720.

We conclude that, even if the arbitration clause is procedurally unconscionable "to a degree," like the class action waiver in Kinkel, that flaw is insufficient by itself to invalidate the clause.

B. Substantive Unconscionability

Substantive unconscionability " 'relates to situations where a clause or term in a contract is allegedly one-sided or overly harsh.' " Zobrist v. Verizon Wireless, 354 Ill. App. 3d 1139, 1147 (2004), quoting Bishop, 316 Ill. App. 3d at 1196.

The trial court found the arbitration clause substantively unconscionable because (1) the clause is "one-sided" in its obligations; and (2) the clause's exclusion of punitive damages violates the Consumer Fraud Act. Neither is a ground for invalidating the arbitration clause.

There is, we recognize, an imbalance of duties in the arbitration clause. The clause provides that "[a]ny controversy, claim, cause of action or other dispute arising out of or relating to [the] contract" is subject to arbitration except (1) "a cause of action or claim by Dealer to recover full payment of the purchase price" and (2) "[c]laims, causes of action and other disputes against Buyer arising out of or related to the breach by Buyer of any retail installment contract executed in connection with [the] contract." Thus, claims by the buyer arising out of or relating to the Second Buyers Order are unqualifiedly subject to arbitration, but significant exceptions exist for claims by the dealer.

What the trial court found lacking is, in the vernacular, mutuality of obligation; but contractual promises need not have such precise proportions. "The parties to a contract need not have identical rights and obligations." Hofmeyer v. Willow Shores Condominium Ass'n, 309 Ill. App. 3d 380, 385 (1999). "The mutuality requirement is satisfied if each party has given sufficient consideration for the other's promise." Hofmeyer, 309 Ill. App. 3d at 385; see also Vassilkovska v. Woodfield Nissan, Inc., 358 Ill. App. 3d 20, 28 (2005) ("[m]utuality of obligation is required only to the extent that both parties to an agreement are bound or neither is bound; that is, if the requirement of consideration has been met, mutuality of obligation is not essential").

How these principles apply with respect to promises to arbitrate is best grasped by comparing Bishop with Vassilkovska. In Bishop, the plaintiffs operated hair salons as franchisees of the defendant and subleased property from the defendant for the salons. The sublease agreements contained "cross-default" clauses authorizing the defendant to evict a franchisee for any breach of its franchise agreement. The franchise agreements contained clauses subjecting to arbitration all claims arising out of or relating to the agreements, except eviction proceedings brought pursuant to the "cross-default" clauses. The plaintiffs challenged the arbitration clauses for lack of mutuality, arguing that "an arbitration agreement is not mutually binding where one party reserves the option to raise and resolve the majority of disputes in a court rather than through arbitration." Bishop, 316 Ill. App. 3d at 1198. The court disagreed, explaining that it would not invalidate "an arbitration clause that compels one party to submit all disputes to arbitration but allows the other party the choice of pursuing arbitration or litigation so long as the contract is otherwise supported by consideration on both sides." Bishop, 316 Ill. App. 3d at 1198. The court held that, because the franchise agreements were undisputedly supported by consideration, the arbitration clauses did not need "identical obligations." Bishop, 316 Ill. App. 3d at 1198.

In Vassilkovska, the plaintiff signed a purchase contract and a separate arbitration agreement in purchasing a vehicle from the defendant. The plaintiff claimed that the arbitration agreement lacked consideration because it broadly required the plaintiff to arbitrate her claims under the purchase contract but effectively exempted the defendant from arbitrating any claim it had concerning the plaintiff's performance under the purchase contract. The appellate court noted that, unlike the court in Bishop, it was "not confronted with an arbitration clause in a contract supported by consideration on both sides." Vassilkovska, 358 Ill. App. 3d at 27. The arbitration agreement, rather,

was "separate and apart from the purchase contract," and therefore the arbitration agreement had to be supported by its own consideration. Vassilkovska, 358 Ill. App. 3d at 25. The court found such consideration lacking because the defendant's promise to arbitrate was "empty" in that it "completely exempted issues that could arise from its sale of the automobile to the plaintiff." Vassilkovska, 358 Ill. App. 3d at 29.

The case at hand is like Bishop, not Vassilkovska, because the promise to arbitrate is part of a clause within a larger contract, the Second Buyers Order. As plaintiff has never questioned that the Second Buyers Order is supported by consideration, the arbitration clause does not suffer for lack of mutuality of obligation.

The trial court also found the arbitration clause invalid for its exclusion of punitive damages. The clause provides that the arbitrator "shall not be empowered to grant exemplary, punitive or consequential damages in excess of those permitted under the express terms of this contract." Paragraph 16 on the reverse side of the Second Buyers Order expressly limits the dealer's liability to the purchase price of the vehicle. Also, the front side contains an express disclaimer of punitive damages. Section 10a(a) of the Consumer Fraud Act (815 ILCS 505/10a(a) (West 2004)) provides that the trial court "in its discretion may award actual economic damages or any other relief which the court deems proper." Such relief may include punitive damages. See Smith v. Prime Cable of Chicago, 276 Ill. App. 3d 843, 858 (1995). Section 10c of the Consumer Fraud Act (815 ILCS 505/10c (West 2004)) provides: "Any waiver or modification of the rights, provisions, or remedies of this Act shall be void and unenforceable." As an attempt to categorically exclude a form of relief authorized by the Consumer Fraud Act, the punitive damages disclaimer in the arbitration clause is void and unenforceable.

The arbitration clause is not, however, void in its entirety, for the punitive damages disclaimer is severable from the remainder of the clause. "In determining whether it is appropriate to sever an unconscionable provision from an agreement and enforce the remainder of the agreement, Illinois courts are to consider whether the provisions operate independently of each other or whether the valid provisions are 'so closely connected with unenforceable provisions that to do so would be tantamount to rewriting the Agreement.' " Kinkel, 357 Ill. App. 3d at 569, quoting Abbott-Interfast Corp. v. Harkabus, 250 Ill. App. 3d 13, 21 (1993). If the disclaimer of punitive damages is stricken, the intent of the arbitration clause remains essentially fulfilled, for there still exists the broad requirement of arbitration. Also significant is the presence of a severability clause in the Second Buyers Order. The clause reads:

"If any term, covenant or condition of this contract or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this contract or the application of such term, covenant or provision, to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant or provision of this contract shall be valid and be enforced to the fullest extent permitted by law."

"The existence of a severability clause in a contract certainly strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions." Harkabus, 250 Ill. App. 3d at 21. Sealing the issue in favor of severance is "the strong policy in favor of enforcing arbitration agreements, which is best served by allowing the valid portions of the arbitration agreement to

remain in force while severing the unconscionable provision." Kinkel, 357 Ill. App. 3d at 569. Therefore, we do not find the arbitration clause substantively unconscionable.

We hold that the trial court erred in declaring the arbitration clause unconscionable and unenforceable in its entirety. The clause is enforceable but for its disclaimer of punitive damages.

We appreciate the trial court's sensitivity to the equities in this case, but we must conclude that its decision cannot be reconciled with Kinkel's pronouncements on unconscionability. Mindful as we are of the express policy in favor of arbitration, we note that, after Kinkel, there is little chance that consumers will "obtain credit cards, rental cars, land and cellular telephone service, home furnishings and appliances, loans, and other products and services" (Kinkel, 223 Ill. 2d at 26) without forgoing any assurance that their claims relating to these types of contracts will have the full protections of the courts.

As a final matter, defendants urge us to clarify that J.P. Morgan, though not a signatory to the Second Buyers Order, is a third-party beneficiary of the contract and so plaintiff is required to arbitrate her claims against both defendants. J.P. Morgan asserted this position below and plaintiff did not contest it. The trial court did not expressly address the issue but proceeded on the assumption that J.P. Morgan is bound by the arbitration clause to the same extent as Gerald Nissan. Plaintiff continues not to dispute the issue. We agree with defendants that J.P. Morgan is a third-party beneficiary of the Second Buyers Order. "A third-party beneficiary is bound by the terms of the contract in the same manner as the parties are bound." Streams Club, Ltd. v. Thompson, 180 Ill. App. 3d 830, 840 (1989). "The third-party beneficiary doctrine applies to arbitration agreements." Dannewitz v. Equicredit Corp. of America, 333 Ill. App. 3d 370, 373 (2002). "Where it is shown that the signatories to the agreement intended that nonsignatories were to derive benefits from the

agreement and where the [agreement] itself is susceptible to this interpretation, then arbitration is proper." Dannewitz, 333 Ill. App. 3d at 373. The Second Buyers Order is expressly conditioned on "third party finance approval," and J.P. Morgan had the benefit of providing financing. Additionally, the arbitration clause does not distinguish between claims brought by the dealer and those brought by a third-party financier, but applies to "[a]ny" claim arising out of or relating to the contract. See Johnson v. Noble, 240 Ill. App. 3d 731, 733 (1992) (employees of corporation that signed contract with plaintiff were third-party beneficiaries of arbitration clause that covered "[a]ny claim or controversy arising out of or relating to [the] agreement"). Plaintiff's claims against J.P. Morgan are equally subject to arbitration as her claims against Gerald Nissan.

For the foregoing reasons, we reverse the judgment of the circuit court of Kane County denying defendants' motions to stay proceedings and compel arbitration, and we remand this cause for further proceedings consistent with this disposition.

Reversed and remanded.

BOWMAN and HUTCHINSON, JJ., concur.