2022 IL App (1st) 210763-U

No. 1-21-0763

Second Division
March 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL REAZUDDIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, |
| Plaintiff-Appellant, | ) | Law Division |
| | ) | |
| v. | ) | No. 20 L 11933 |
| | ) | |
| GOLD COAST EXOTIC IMPORTS, LLC, | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Michael F. Otto, |
| | ) | Judge, presiding. |
| | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court properly granted defendant's motion to stay the plaintiff's complaint in favor of arbitration where the relevant arbitration provisions were not procedurally unconscionable or fraudulently induced. Additionally, plaintiff forfeited any argument concerning whether he improperly entered into a contract in an agency capacity, rendering it unenforceable.

¶ 2    This case concerns the interpretation of an agreement to arbitrate pursuant to Section 2 of

the Illinois Uniform Arbitration Act (710 ILCS 5/2 (West 2020)). Plaintiff-appellant, Michael

Reazuddin, filed a two-count complaint against defendant-appellee, Gold Coast Exotic Imports, LLC, alleging common-law fraud and violations of the Illinois Consumer Fraud and Deceptive Practices Act (815 ILCS 505/1, *et seq.* (West 2020)). Gold Coast moved to stay the litigation and remand the matter to arbitration, which the circuit court granted. On appeal, Reazuddin argues that the circuit court erred in granting the motion to stay where he entered into a contract on behalf of another in an agency capacity, rendering the contract unenforceable, and the arbitration agreements were procedurally unconscionable and fraudulently induced. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. The Vehicle Purchase

¶ 5     Reazuddin is a resident of Kansas. Gold Coast is an Illinois limited liability company that does business in Chicago under the name Perillo BMW. Gold Coast advertises itself as specializing in the sale of high-priced vehicles.

¶ 6     On July 15, 2019, Reazuddin visited Gold Coast with the intention to purchase a vehicle as an anniversary gift for his significant other, Mahreen Husain. Upon arriving at the dealership, Mir Khan, an employee of Gold Coast, approached Reazuddin and attempted to sell him a 2012 Rolls-Royce (the vehicle). According to Reazuddin, Khan indicated that "[e]verything worked on the vehicle" and it was reliable because it only had a mileage of 55,929 miles. Khan also indicated that the sole previous owner had always had the vehicle serviced by Gold Coast, but, in the event that there was an issue with the vehicle, Gold Coast "would get it fixed right away."

¶ 7     Reazuddin was "reluctant" to purchase the vehicle, and initially "refused and left" the dealership. After he left, Khan "came running outside" and offered Reazuddin a $10,000 discount if Reazuddin purchased the vehicle that same day. Subsequently, Reazuddin agreed to purchase the vehicle for $98,000.

¶ 8    .                              B. The Arbitration Provisions

¶ 9    Gold Coast proceeded to draft a contract for the purchase of the vehicle (purchase order). The purchase order consisted of three main preprinted pages, with additional documents as riders to the underlying contract.

¶ 10    The first page of the purchase order indicated that Khan was the salesperson, the vehicle being sold was a 2012 Rolls-Royce, Model Ghost, and the vehicle was in "used" condition with 55,929 miles. The purchase order also contained a blank box to be filled in by the salesperson. The heading of the box stated: "New cars equipped per factory window sticker: Dealer installation or promises made." The box was filled out to read "[n]o dealer installed equipment."

¶ 11    Also on the first page, the purchase order contained various blank sections that allowed for the transaction to become personalized based on any representations made by a salesperson to a potential customer. For example, page one of the purchase order contained a blank box that indicated an area for "all oral representations or statements made by salesperson or any Dealer personnel about the Vehicle that are important to buyer/seller in deciding on this transaction." This section of the purchase order was left blank. Underneath this area, the purchase order provided that: "Nothing promised or owed to customer unless in writing." Additionally, on the second page of the purchase order, highlighted in red bolded capital letters, it was further noted that "[o]nce again, if a salesperson or agent of Gold Coast Exotic Imports, LLC promised you anything—it must be noted in this Order."

¶ 12    The second page of the purchase order also contained a provision that expressly incorporated other documents within:

"The Required Information, and other disclosures contained on the Retail

Installment Contract[,] are a part of this Order. By signing this order, Customer

acknowledges *having read the front or back of this document, and received copies, where relevant of the Customer Protection Notice*, immediate delivery rider, *arbitration provisions and power of attorney*, and agree that they are a part of this Order."

(Emphasis added.) The purchase order also contained a "disclosure statement and *** additional terms and conditions," which were "integral part[s] of the *** Order for the Vehicle." The disclosure warned that "failure to read the specific conditions listed on th[e] page [was] not a defense and [that the Customer was] legally and financially responsible for any false or inaccurate information."

¶ 13    Next, section 3 of the disclosure was an "arbitration of dispute" provision, which provided, in its entirety:

"Parties agree any claim or dispute, whether in contract, tort or otherwise, between customer and Gold Coast *** (and their respective employees, agents, successors, or assigns) which arise out of or relate to this vehicle purchase order, the application for, negotiation of, and financing for the vehicle, any dispute relating to any service contract, extended warranty or other product purchased *is subject to arbitration under these provisions*, or any resulting transaction or relationship shall be submitted to the American Arbitration Association of Chicago, Illinois or its successors conducted in accordance with the rules of the purchase order and shall be final and binding on the parties. Judgment on the award of the arbitrator will be enforced in any court of competent jurisdiction. The prevailing party in the arbitration shall be entitled to receive from the other party his/its reasonable legal fees and all other court costs."

(Emphasis added.)

¶ 14    Lastly, Reazuddin was also provided a separate document entitled "Out of State Arbitration Claims" (arbitration agreement), which further expanded upon the arbitration provisions contained within the purchase order. The arbitration agreement provided that it was:

> "[M]utually agreed between the parties herein that any claim or dispute whether in contract, tort, or otherwise, between Purchaser and seller (and their respective employees, agents, successors, or assigns) which arise out of or relate to this vehicle purchase order or any resulting or related transaction or relationship shall be submitted to the American Arbitration Association of Chicago, Illinois, conducted in accordance with the rules of said association, and according to the terms of the purchase order and shall be final and binding on the parties. Judgment on the award of the arbitrator shall be enforced in any court of competent jurisdiction. *** Applicable law for the State of Illinois shall govern validity, performance, and enforcement of this agreement."

¶ 15    Reazuddin proceeded to sign the relevant documents. Although the purchase order listed the "Customer" as "Mahreen Husain," Reazuddin signed his name on this document with the phrase "as agent" in four separate locations.[1] Additionally, although "Mahreen Husain" was listed as the "Transferee" on an "Odometer Disclosure Statement," which listed the mileage of the Vehicle as 55,929 miles, Reazuddin again signed this document "as agent." Lastly, Reazuddin signed the arbitration agreement as "agent." No other customer signature was contained within the purchase order or arbitration agreement.

---

[1] The record reflects multiple spellings of Ms. Husain's first and last names. We choose to proceed with this version as it was the spelling listed within the purchase order and other relevant documents.

¶ 16　　After signing the relevant documents, Reazuddin left the dealership again to obtain two separate cashier's checks from his bank in an amount totaling $98,229.81. Gold Coast cashed both checks and then tendered possession of the vehicle to Reazuddin. Gold Coast also completed an "Assignment of Title by Registered Owner" following the purchase of the vehicle to transfer title to "Mahreen Husain." The title showed that actual mileage of the vehicle at time of transfer was 57,927 miles.

¶ 17　　　　　　　　　　　C. The Vehicle Breaks Down

¶ 18　　After taking possession of the vehicle, Reazuddin proceeded to drive the car away from the dealership in order to return to his residence in Kansas. However, after "driving the vehicle for less than two *** hours" and "seventy *** miles" from the dealership, the vehicle "broke down and became entirely inoperable." According to Reazuddin, the "entire front end of the vehicle collapsed *** liquid and oil were pouring out of the vehicle, and all of the power functions of the Vehicle were entirely inoperable."

¶ 19　　Subsequently, Reazuddin called Khan and indicated that the vehicle had broken down on the highway. Reazuddin requested that Gold Coast repair the vehicle or provide a full refund of his purchase. Khan refused to repair the vehicle, indicating that the vehicle had been sold to Reazuddin "as is." Reazuddin then requested that Gold Coast "void" the purchase order, which was again rejected by Khan. Khan also refused to tow the vehicle, and Reazuddin proceeded to call his own towing service.

¶ 20　　In the weeks following the incident, Reazuddin continued to call Gold Coast and reiterated his desire to either have the vehicle repaired or receive a refund on the purchase. Gold Coast continued to refuse either request.

¶ 21    On August 8, 2019, Reazuddin received the title for the vehicle. At this time, Reazuddin purportedly learned that the vehicle had been involved in an accident prior to his purchase.

¶ 22    On October 22, 2019, Gold Coast sent a towing service to retrieve the vehicle from Reazuddin in Kansas. The vehicle has since remained in possession of the dealership.

¶ 23                                  D. Trial Court Proceedings

¶ 24    On November 6, 2020, Reazuddin filed a two-count complaint against Gold Coast, alleging both common-law fraud and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq.* (West 2020)). Specifically, Reazuddin alleged that Gold Coast "engaged in a deceptive act and/or practice" by mispresenting and selling a defective automobile upon which Reazuddin relied to purchase the vehicle. Reazuddin attached the purchase order, arbitration agreement, and title of the vehicle as exhibits to the complaint.

¶ 25    On March 26, 2021, Gold Coast filed a "Motion to Stay Pending Arbitration" pursuant to section 2 of the Illinois Uniform Arbitration Act (720 ILCS 5/2(a) (West 2020)) (the Act). In the motion, Gold Coast argued that the complaint concerned issues that Reazuddin had agreed to arbitrate pursuant to the arbitration provisions contained within the purchase order and the arbitration agreement.

¶ 26    Reazuddin filed a response, which included Reazuddin's affidavit. In the affidavit, Reazuddin averred that he had sought to purchase the vehicle as a gift for his significant other. Reazuddin described the exchange between himself and Khan as "aggressive and pushy" and that because he felt "incredibly rushed," he signed all the relevant contractual paperwork, including the arbitration agreements. Reazuddin further averred that he "noticed something [in the purchase order] that said arbitration," and asked Khan what that provision meant. According to Reazuddin, Khan stated "[D]on't worry about the arbitration provision, [Gold Coast] will take care of any and

all issues without ever arbitrating anything. This car is perfect, but even if there is an issue, [Gold Coast] will take care of it without needing to arbitrate." Reazuddin averred that he responded that he "did not want to arbitrate all claims," to which Khan replied, "If you do not sign it, I will not be able to take care of you if you have a problem with the vehicle." Reazuddin's affidavit provided that he relied on such statements and that he "genuinely felt as though [he] had no other choice[,]" and thus signed the relevant paperwork as his "significant other's agent (which [he] later discovered [was] unlawful)[.]" Finally, Reazuddin averred that he had been forced to expend additional funds on alternate transportation, towing, legal costs, and other expenses.

¶ 27    In his response, Reazuddin argued that the arbitration clauses contained within the purchase order and arbitration agreement were unenforceable because the arbitration provisions were procedurally and substantively unconscionable, and that he had been "fraudulently induced to enter into the arbitration agreement." With regard to the argument concerning fraudulent inducement, Reazuddin reiterated much of the same allegations contained within his complaint, namely that Gold Coast had engaged in deceptive practices through misrepresentations upon which Reazuddin had relied, but further stated that Khan had knowingly made false statements about the condition of the vehicle as he knew Gold Coast "would not take care of any and all issues without arbitrating anything."

¶ 28    Next, Reazuddin contended that the arbitration provisions were unconscionable because they "limit[ed] the remedies available to [him,]" and he would be "forced to accept the award of the arbitration as well as without being able to recover punitive damages for [Gold Coast's] egregious misconduct." Reazuddin asserted that the arbitration provisions were "so one-sided as to oppress and unfairly surprise [him] and evidence[d] the clear overall imbalance in the obligations and rights" of the parties. Last, Reazuddin argued that the arbitration agreement was

not legally enforceable because it was "not a bargain[*sic*] for exchange as there was not a mutual promise to arbitrate between the parties" and thus constituted "forced arbitration."

¶ 29    Gold Coast filed a reply but did not submit a counter-affidavit. Gold Coast argued that the arbitrator, not the trial court, was responsible for determining whether fraud had resulted in the inducement of a contract. Alternatively, Gold Coast argued, even if the circuit court were to consider Reazuddin's fraudulent inducement arguments, under Illinois law, a party has a "general duty to read" documents before signing them and courts could not grant relief simply because one party failed to exercise reasonable care before signing such an agreement. Gold Coast pointed out that Reazuddin had signed two separate arbitration agreements, and any statement made by its employee was a statement of "non-actionable intention of future conduct" rather than a misrepresentation. As to Reazuddin's assertions that he had "felt rushed" during the transaction, Gold Coast reiterated Reazuddin's duty to read the purchase order before signing, which would defeat any element of "reasonable reliance" to establish fraudulent inducement.

¶ 30    As to whether the arbitration provisions were procedurally unconscionable, Gold Coast observed that Reazuddin admitted that he had read or at least had "noticed" the arbitration provision and that Reazuddin was a "sophisticated businessman" who had purchased a $100,000 vehicle. Further, Gold Coast reasoned, just because the contract had been drafted by another party in a superior bargaining position did not render the contract unconscionable, given that such contracts were routinely signed in the normal course of business. As to substantive unconscionability, Gold Coast argued that there was no evidence that Reazuddin would be limited in seeking damages through arbitration.

¶ 31    On June 3, 2021, the circuit court heard arguments on Gold Coast's motion. There, for the first time before the circuit court, Reazuddin's counsel attempted to raise the argument that

Reazuddin had unlawfully signed the relevant documents as an "agent" of his significant other, Hussain, and thus the arbitration provisions were null and void. Before counsel could continue further, the circuit court inquired as to whether that argument had been raised in the briefing:

"[PLAINTIFF'S COUNSEL]: And, again, the last point that I would make *** [is that] the defendant knew that as—indicated on the order or on the purchase order that the *** alleged customer was listed as [Ms. Hussain]. *** With respect to that, [Reazuddin] signed each document as the agent for *** wife [Mahreen] Husain. And in each instance, he indicated that he was acting as a power of attorney. And with being a power of attorney, the equal dignities rule requires that they actually have a written agreement for the power of attorney present in order for that contract to be enforceable.

So I just wanted to make that noted on the record as well that he made the defendant aware, as pled in the complaint, that he was acting as an agent. He notified them that he did not currently have the power of attorney, and Defendants assured him it was okay. And they read them through. He signed each document as agent. So according to that *** [t]he contract also is not enforceable.

THE COURT: I'm sorry. Before we move on from that point, can you please remind me where any argument relating to the reported invalidity of the contract based on the lack of a written agency agreement was made in your brief and in opposition to the motion?

[PLAINTIFF'S COUNSEL]: Well, it was not in the specific argument. [It is] contained in paragraph 12 of Plaintiff's affidavit, which specifically indicates—

THE COURT: It says, relying on Defendant's statements and because I genuinely felt as though I had no other choice, I was induced to sign the sales paperwork as my significant other's agent, parentheses, which I later discovered is unlawful, closed parenthese[s], and ultimately paid for the vehicle.

THE COURT: Is that the paragraph in which you are referring?

[PLAINTIFF'S COUNSEL]: Yes, [Y]our Honor.

THE COURT: Okay. But if you haven't made this argument at all in your brief, I'm not going to entertain it today. Moreover, even if I were, this is clearly an argument that would go to the validity of the contract as a whole, not specifically the arbitration provision. And so it is not a matter that I can properly consider in the context of evaluating arbitrarily according to the *Coe* case, correct?

[PLAINTIFF'S COUNSEL]: Understood. Yes, [Y]our Honor, correct."

As to the remaining arguments in the briefing, the circuit court also observed that Reazuddin had expressly stated in his sworn affidavit that he had seen the arbitration provision and had specifically asked about it during the transaction. The court also inquired as to whether there had been any issue of a language barrier between Reazuddin and Khan, and Reazuddin's counsel confirmed that there was not.

¶ 32    Subsequently, the circuit court granted Gold Coast's motion and referred the matter to arbitration. The court first addressed the issue of substantive unconscionability, finding no evidence of such and that any arguments on that issue were reserved for the arbitrator pursuant to *Coe v. BDO Seidman, LLP*, 2015 IL App (1st) 142215. Next, the circuit court addressed the issues of procedural unconscionability and fraudulent inducement in tandem, acknowledging that there was a "closer question with regard to" the two. Nevertheless, the circuit court granted the motion

to stay, finding no evidence of either. The circuit court relied on the fact that Reazuddin's affidavit had indicated that he had "noticed" the word "arbitration" and had even discussed his objection to arbitrate with Khan. This, according to the circuit court, demonstrated that Reazuddin knew to some extent what he was being asked to sign. The circuit court also rejected Reazuddin's characterization of Khan's "high-pressure sales tactics" by pointing out that Reazuddin had left the dealership at least once, and only returned once a $10,000 discount was offered. The circuit court found that "[i]f [Reazuddin] had not wanted to enter into the contract, he had already that day proven himself able to resist what he himself characterizes as, quote, aggressive and pushy attempts to sell, unquote, in paragraph 3 of his affidavit." The circuit court further found that the uncontested factual allegations of the case did not fit within a "narrow class of exceptions to the duty to read" and that there was strong public policy favoring arbitration agreements.

¶ 33     This appeal followed.

¶ 34                                    II. ANALYSIS

¶ 35     On appeal, Reazuddin argues that the circuit court erred in granting Gold Coast's motion to stay for essentially two main reasons. First, Reazuddin contends that there was no valid arbitration agreement between him and Gold Coast because he had signed all documents as an "agent" for Husain, while never actually having authority to do so.[2] Second, Reazuddin urges this court to find the arbitration provisions invalid because they were procedurally unconscionable and he was fraudulently induced to sign them. We will address each argument in turn.

¶ 36                              B. Standard of Review

---

[2] Although Reazuddin characterizes this argument as two separate bases for appeal—first, that he signed the contracts as an agent, and not in his individual capacity, and second, that he lacked any authority to sign on behalf of his partner—we construe them as a single argument as both arguments concern interrelated principles of agency.

¶ 37    Initially, the parties dispute the proper standard of review. Reazuddin contends that the standard is *de novo*. Citing *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance*, 2016 IL App (1st) 161612, and *Coe v. BDO Seidman, LLP*, 2015 IL App (1st) 142215, for support, Reazuddin argues that an order granting a motion to stay or compel arbitration without an evidentiary hearing is a "purely legal issue," Additionally, Reazuddin contends that *de novo* review is warranted because a motion to stay or compel arbitration is similar to a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2020)).

¶ 38    On the other hand, Gold Coast argues that the proper standard is abuse of discretion because, contrary to Reazuddin's assertion, the circuit court substantively considered Reazuddin's affidavit in support of his response to the motion. Relying on *Northeast Illinois Regional Commuter R.R. Corp. v. Chicago Union Station Co.*, 358 Ill. App. 3d 985 (2005), and *People v. Carter*, 2017 IL App (1st) 151297, Gold Coast reasons that the consideration of the affidavit is tantamount to an evidentiary hearing, which resulted in a factual inquiry by the circuit court and thus warrants a more deferential standard.

¶ 39    We find the Act instructive. The Act codifies the legislature's endorsement of arbitration agreements. 710 ILCS 5/1 (West 2020); *Liu v. Four Seasons Hotel, Ltd.*, 2019 IL App (1st) 182645, ¶ 24; see also *Acme-Wiley Holdings v. Buck*, 343 Ill. App. 3d 1098, 1103 (2003). As such, the Act only contemplates court intervention in the event that there is evidence of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. *City of Aurora v. Ass'n of Professional Police Officers*, 2019 IL App (2d) 180375, ¶ 52.  Accordingly, Section 2 of the Act governs proceedings to compel or stay arbitration. 710 ILCS 5/2 (West 2020); *Liu*, 2019 IL App (1st) 182645, ¶ 24.

¶ 40 Pursuant to section 2(a), "[o]n application of a party showing an agreement [to arbitrate], and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration[.]" 710 ILCS 5/2(a) (West 2020). In the event that the opposing party "denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied." *Id.* The "summary proceeding" as delineated in section 2(a) of the Act has been interpreted as "a proceeding in the nature of a trial without the formalities—such as an indictment, pleadings, and jury—and used for the speedy and peremptory disposition of the matter." (Internal quotation marks omitted.) *Herns v. Symphony Jackson Square, LLC*, 2021 IL App (1st) 201064, ¶ 29.

¶ 41 "Normally, in an interlocutory appeal from a ruling on a motion to stay proceedings, the circuit court's decision is reviewed under the abuse of discretion standard." *Hayes v. Victory Centre of Melrose Park SLF, Inc.*, 2017 IL App (1st) 162207, ¶ 11; see also *Federal Signal Corp. v. SLC Technologies, Inc.*, 318 Ill. App. 3d 1101, 1005 (2001) (citing *Notaro v. Nor-Evan Corp.*, 98 Ill. 2d 268, 270-71 (1983)) (an order granting or denying a motion to compel is injunctive in nature and appealable under Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017)). The relevant inquiry on review is "whether there was a showing sufficient to sustain the trial court's order." *CSC Partners Management, LLC v. ADM Investor Services, Inc.*, 2021 IL App (1st) 210136, ¶ 25 (citing *Cohen v. Blockbuster Entertainment, Inc.*, 338 Ill. App. 3d 171, 177 (2003)); see, *e.g.*, *Herns*, 2021 IL App (1st) 201064, ¶ 31 (whether a valid arbitration agreement existed if the signing party lacked authority to enter into such an agreement); see also *Northeast*, 358 Ill. App. at 994-95 (determining whether a trial court's ruling on a motion to compel arbitration implicated a "factual inquiry" that triggered an abuse of discretion standard rather than *de novo*).

¶ 42     In contrast, when "the facts at issue are not in dispute, and the circuit court ma[kes] no findings in denying [or granting] the stay," the court's review is *de novo*. *Hayes*, 2017 IL App (1st) 162207, ¶ 11; see also *Liu*, 2019 IL App (1st) 182645, ¶ 22 (when a motion to compel is ruled upon without evidentiary hearing, *de novo* review is appropriate as the narrow issue before the court concerns the interpretation of an arbitration agreement and thus presents a question of law); see also *Griffith v. Wilmette Harbor Ass'n, Inc.*, 378 Ill. App. 3d 173, 178-80 (2007) (courts consider motions to compel arbitration to be similar to a section 2-619(a)(9) motion to dismiss and thus review *de novo*); see also *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 219-221, 227 (2008) (although trial court heard live testimony regarding the unconscionability of an arbitration clause, appellate court held that ultimate determination of unconscionability was reviewable *de novo*).

¶ 43     Here, it is undisputed that *some kind* of hearing took place before the circuit court, as the court held oral argument on the motion, but no live testimony was taken requiring factual findings. Additionally, as noted above, courts have likened a motion to stay or compel arbitration to a section 2-619(a)(9) motion to dismiss, which is generally subject to *de novo* review. *Griffith*, 378 Ill. App. 3d at 179-80; *Kedzie and 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). Section 2-619(a)(9) permits involuntary dismissal where the claim asserted against the defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim. 735 ILCS 5/2-619(a)(9) (West 2020); *Patrick Engineering, Inc.,* 2012 IL 113148, ¶ 31.

¶ 44     Based on the record before us, we believe *de novo* review is the appropriate standard. In finding that the arbitration agreement was not substantively unconscionable, the circuit court examined the plain language of the arbitration agreements and found that that a lack of a jury trial in the arbitration context did not render the arbitration provisions substantially unconscionable. As

to the issues of procedural unconscionability and fraudulent inducement, the circuit court noted that, while its ruling was a closer call on these two issues, it did not find any evidence of either. Specifically, the circuit court considered Reazuddin's affidavit attached to his response to the motion to stay, and stated:

"There is nothing that suggests that the plaintiff was unable to read in terms of literacy or unable to understand English. And on the contrary, the plaintiff avers that he not only noticed the word "arbitration[,"] but specifically discussed with the salesperson his objection to agreeing to arbitrate all claims. I do not believe that there is a basis for finding procedural unconscionability or fraudulent inducement where the plaintiff knew to that extent what it was that he was being asked to sign, especially when as defense counsel *** pointed out that, in the context of deciding whether *** there was unfair pressure or improper sales tactics, he had previously left the dealership. He clearly knew how to resist and was able to resist any pressure that the salesperson Khan placed on him *** before the $10,000 discount was offered. If he had not wanted to enter into the contract, he had already that day proven himself able to resist what he himself characterizes as, quote, aggressive and pushy attempts to sell, unquote, in paragraph 3 of his affidavit.

*** *** ***

Given the uncontested factual allegations in this case, I do not believe that this case fits within that narrow class of exceptions to the duty to read or the strong public policy in favor of arbitration agreements, so I am going to grant the motion."

(Emphasis added.) The transcript indicates that the circuit court considered both the complaint and the "uncontested factual allegations" in Reazuddin's affidavit to conclude that the matter should

be referred to arbitration. Gold Coast did not present a counter-affidavit, and thus, similar to a section 2-619(a)(9) motion to dismiss, Gold Coast accepted the factual allegations of the complaint as true and placed the matter of arbitrability as the "affirmative matter" before the circuit court. See *Griffith*, 378 Ill. App. 3d at 179-80 (a motion to compel admits the legal sufficiency of the complaint but puts forth some affirmative matter that prevents the lawsuit from moving forward). Thus, the circuit court never had to make any findings on any factual dispute between the parties. Further, because an evidentiary hearing as contemplated by Section 2(a) of the Act was never held (e.g., absence of live testimony, swearing in of witnesses), we agree with Reazuddin that on these facts, the record before us presents a question of law, and thus the appropriate standard of review for this appeal is *de novo*.

¶ 45                                    C. Forfeiture

¶ 46    As a preliminary matter, we must determine whether Reazuddin's claim concerning his ability to enter into a contract on behalf of Husain is forfeited. A majority of Reazuddin's brief is dedicated to advancing the argument that the arbitration provisions are null and void because he signed each contract as "agent" of Husain rather than in his "personal capacity." However, Reazuddin concedes that he did *not* raise these arguments before the circuit court and thus generally, this issue would not be considered. Nevertheless, Reazuddin urges this court to disregard well-established rules of "waiver" because (1) the issue of agency was preserved when raised to the circuit court during oral argument; and (2) alternatively, *Hordowicz v. Szulc*, 16 Ill. App. 2d 317 (1958), and Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), support relaxation of the rule, even if the issue was not preserved. Not surprisingly, Gold Coast responds that the issue of agency was "forfeited," given that it was only mentioned for the first time before the circuit court in oral argument. Further, Gold Coast asserts that the invited error doctrine

precludes any further review because a party cannot "acquiesce to the manner in which the trial court proceeds and then later claim error on appeal."

¶ 47    Prior to proceeding, we deem it appropriate to clarify the difference between "waiver" and "forfeiture." Although the concepts of waiver and forfeiture are commonly used interchangeably by the parties, as they have done here, as well as by courts, the two are distinct. *Pinske v. Allstate Property and Casualty Insurance Co.*, 2015 IL App (1st) 150537, ¶ 18. "Waiver" is the "voluntary relinquishment of a known right," whereas "forfeiture" refers to "the failure to make the timely assertion of the right." *Id.* (quoting *People v. Blair*, 215 Ill. 2d at 444 n.2 (2005)). Regardless of the characterization, "[i]t is axiomatic that questions not raised in the trial court *** may not be raised for the first time on appeal." *Shell Oil Co. v. Department of Revenue*, 95 Ill. 2d 541, 550 (1983). "However, waiver and forfeiture rules serve as an admonition to litigants[,] rather than a limitation upon the jurisdiction of the reviewing court" and thus we may "sometimes override considerations of waiver and forfeiture in order to achieve a just result and maintain a sound and uniform body of precedent." *Pinske*, 2015 IL App (1st) 150537, ¶ 19 (citing *Daley v. License Appeal Comm'n*, 311 Ill. App. 3d 194, 200 (1999)).

¶ 48    It is undisputed that Reazuddin's written response to Gold Coast's motion to stay did not include any argument regarding the validity of the arbitration provisions based on his signing the documents as Hussain's "agent." Indeed, the only mention of agency was contained within a single line in Reazuddin's affidavit, which stated: "Relying on [Gold Coast]'s statement, and because I genuinely felt as though I had no other choice, I was induced to sign the sales paperwork as my significant other's agent (which I later discovered is unlawful), and ultimately pay for the vehicle." It is worth noting that within that same affidavit, Reazuddin averred that he "agreed to purchase

the *** Vehicle *as a gift for my significant other for our ten *** year anniversary*." (Emphasis added.)

¶ 49    Additionally, as discussed above, although counsel for Reazuddin attempted to raise the issue before the circuit court, the circuit court did not entertain it. Thus, it appears that Reazuddin was aware that the argument concerning agency *could* have been raised within the response to the motion.

¶ 50    However, we do not find that the failure to raise the agency issue in the briefs constituted a voluntary *relinquishment* of the right to make such an argument.  In his exchange with the court, counsel for Reazuddin simply acknowledged that the argument was not contained in the written response, thus implicitly agreeing that the argument could have been made. As such, the record demonstrates a forfeiture, as opposed to waiver, of the argument that Reazuddin attempts to assert here. See *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 26 (defendants did not waive claim when there was no evidence of any statement of relinquishment or abandonment of challenge to ordinance); see also *People v. Tapia*, 2014 IL App (2d) 111314, ¶ 37 (holding that defendant did not knowingly give up a claim for ineffective assistance of counsel when counsel failed to correct an error in court filing, but because support for the claim existed and defendant could have raised it in a post-judgment motion, the claim was forfeited).

¶ 51    Reazuddin correctly notes that, pursuant to Illinois Supreme Court Rule 366(a)(5), this court may consider waived or forfeited arguments on appeal in order to produce "a just result and for the maintenance of a strong and uniform body of precedent." *Daley*, 311 Ill. App. 3d at 200. However, we do not find that the record before us warrants relaxation of the forfeiture rule. Further, the cases to which Reazuddin cites in support of his request for forfeiture relaxation involve extraordinary circumstances that are not present here.  See *Hodorowicz*, 16 Ill. App. 2d at 319-20

(appellate court considered otherwise forfeited arguments because defendants had previously raised them in a defective answer to complaint); see *Daley*, 311 Ill. App. 3d at 200-01 (reviewing an otherwise forfeited argument following the issuance of a separate appellate court decision that had a direct effect on the instant appeal and could not have been raised before the administrative agency and trial court); see *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 140, 243 (1994) (considering equitable estoppel argument in appeal of a case otherwise barred by statute of limitations defense as a matter of fairness).

¶ 52    As the plaintiff, Reazuddin was in control of the content of his complaint, as well as the response to the motion to stay.  In the response to the motion, Reazuddin articulated, in a single line in an affidavit, in conclusory fashion, that he believed signing as "agent" on behalf of Husain was unlawful. Relaxation of the forfeiture rule would neither cause an unjust result nor fail to maintain a sound and uniform body of precedent. Accordingly, we hold that any argument as to agency was forfeited and, without expressing any opinion as to the sufficiency of the argument itself, decline to address it here.

¶ 53                              D. The Arbitration Agreements

¶ 54    Having disposed of the agency issue, we turn now to Reazuddin's remaining arguments: whether the arbitration provisions were procedurally unconscionable and fraudulently induced. We begin by reemphasizing the well-established public policy that Illinois actively favors arbitration agreements and courts retain little discretion in the review of such agreements absent findings of fraud, corruption, partiality, misconduct, mistake, or failure to submit the question to arbitration. *Heiden*, 223 Ill. App. 3d at 166-67; *City of Aurora*, 2019 IL App (2d) 180375, ¶ 52; see also *Coe*, 2015 IL App (1st) 142215, ¶ 32 ("[C]ourts can only address the issue of whether the

arbitration clause itself was fraudulently induced [while] [t]he question of whether fraud permeated the entire contract, including the arbitration clause, is one for the arbitrator.").

¶ 55    "An agreement to arbitrate presents a matter of contract." *Liu*, 2019 IL App (1st) 182645, ¶ 25. The primary purpose of such an agreement is to "enable the parties to secure a speedy determination of their differences without conforming to the strict formalities necessary in a court of law." *Heiden*, 223 Ill. App. 3d at 166-67 (citing *Wilhelm v. Universal Underwriters Insurance Co.*, 60 Ill. App. 3d 894, 899 (1978)). Parties to an agreement are "bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Liu*, 2019 IL App (1st) 182645, ¶ 25. Thus, when construing a contract, we seek to effectuate the intent of the parties by examining the contract as a whole, with attention to the express language of the contract through its plain and ordinary meaning. *Id.*

¶ 56    "[T]he decision whether to compel arbitration is not discretionary." *Travis v. American Manufacturers Mutual Insurance Co.*, 335 Ill. App. 3d 1171, 1175 (2002). Indeed, arbitration is mandatory when there is a valid agreement in place and the parties' dispute falls within the scope of that agreement. *Id.* "On the other hand, where there is no valid arbitration agreement or where the parties' dispute does not fall within the scope of that agreement, the trial court may not compel it." *Id.* Accordingly, review of "[a] motion to compel [arbitration] raises a sole and narrow issue," namely, "whether the parties agreed to arbitrate the dispute." *Liu*, 2019 IL App (1st) 182645, ¶ 24. This determination aligns squarely with the long-held principle that a party cannot be forced to arbitrate a dispute that the party has not agreed to submit to arbitration. *Id.* (citing *Roubik v. Merrill Lynch, Pierce, Fenner & Smith*, 181 Ill. 2d 373, 382 (1998)).

¶ 57        1. Whether the Arbitration Provisions are Procedurally Unconscionable

¶ 58 Although Reazuddin argued before the circuit court that the relevant contract provisions were both substantively and procedurally unconscionable, Reazuddin's argument on appeal is limited to the issue of procedural unconscionability.[3] Accordingly, we assess whether the circuit court erred in finding that the arbitration provisions were not procedurally unconscionable.

¶ 59 " 'Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that [a party] cannot fairly be said to have been aware he was agreeing to it ***.' " *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006) (quoting *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006)). Thus, courts will examine whether there was "some impropriety during the process of forming the contract[,] depriving a party of a meaningful choice." *Id.* at 23 (citing *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts, Co.*, 86 Ill. App. 3d 980, 989-90 (1980)). Courts consider all of the circumstances surrounding the transaction, such as "whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.* Courts also examine the "conspicuousness of the clause" and the negotiations relating to it, although both are not conclusive. *Id.* Courts may also consider the parties' experience and education, whether the contract contained fine print, and if high-pressure tactics were used. *Coe*, 2015 IL App (1st) 142215, ¶ 31. Further, courts have noted that, "even if the arbitration clause is procedurally unconscionable *to a degree*, *** that flaw is insufficient by itself to invalidate the clause." (Emphasis added.) *Tortoriello*, 379 Ill. App. 3d at 236.

---

[3] Gold Coast contends that both procedural and substantive unconscionability must be found in order to invalidate an arbitration provision, but courts have previously rejected that contention. See *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 21 (2006) ("A finding of unconscionability may be based on either procedural or substantive unconscionability."); see also *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989 (1980) ("Unconscionability can be either procedural or substantive or a combination of both.").

¶ 60    Reazuddin argues that the circuit court erred in finding no evidence of procedural unconscionability, highlighting his averment that he was "rushed" during the transaction and did not have a proper opportunity to review, as a non-lawyer, any of the relevant provisions of the purchase order and arbitration agreement. As previously noted, the purchase order consisted of three pages. On page two, an acknowledgment reads, in regular print but in capital letters, that the customer "acknowledge[d] having read the front and back of this document, and received copies" of other relevant documents such as the "arbitration provisions." On page three of the purchase order, in red and bolded text, the document provides that "the additional terms and conditions *listed on this page are an integral part of your Order for the Vehicle*[,]" the customer was urged to "[p]lease read carefully; *your failure to read the specific conditions is not a defense*," and if the customer "signed or initiated any riders, they are part of this Order." (Emphasis added.) Finally, section 3 of the conditions page is titled "Arbitration of disputes." Although this portion of the purchase order is in plain black text and neither bolded nor highlighted, Reazuddin's affidavit indicated that he "noticed the word arbitration," meaning that he was able to identify it among the text.

¶ 61    Additionally, the stand-alone arbitration agreement, which is no more than two paragraphs, is solely dedicated to the issue of arbitration, and thus we cannot conclude that there is such a "maze of text" or a lack of a conspicuous text that would hide the subject of arbitration from Reazuddin. Further, most of the language of the arbitration agreement merely echoed the text already contained in section 3 of the purchase order, with the exception of added language that Illinois law governed any dispute between the parties. See *Tortoriello*, 379 Ill. App. 3d at 226 (noting that "even an arbitration clause hidden in a maze of fine print where it is unlikely to be

noticed, much less read may be considered part of the bargain[,] if it was brought to the consumer's attention elsewhere in the contract." (Internal quotations and citations omitted.).

¶ 62    Reazuddin's sworn statements indicated that he was not only able to identify the arbitration provisions within the relevant documents, but that he also understood what they meant. After considering the relevant documents, on balance, we cannot say that there is any evidence that the arbitration provisions were not "plainly visible in the agreement" and that "the meaning of its terms were [not] clear." *Coe*, 2015 IL App (1st) 142215, ¶ 31. Further, nothing within the language of the purchase order or the arbitration agreement appears out of the ordinary. See *Kinkel,* 223 Ill. 2d at 26 (noting that non-negotiable arbitration clauses presented in fine print are a "fact of modern life," even if the average consumer might not fully understand them); see also *Tortoriello,* 379 Ill. App. 3d at 234 ("Relatedly, we note that the 'disparity of bargaining power' identified by the trial court is not fatal to the arbitration clause" because, as noted by our supreme court, such contracts "are typical of contracts of adhesion, which are not *per se* unconscionable.").

¶ 63    Turning to the actual circumstances of the transaction, we must first note that the transaction at issue involved the sale of a vehicle estimated to be worth at least $98,000 at a luxury car dealership. Although Reazuddin makes much of the fact that he is a "non-lawyer" and there was no evidence that he was a "sophisticated businessman," it is implicit from the record that he was not a low-income buyer and chose to drive from Kansas to Chicago to inspect a specialty automobile. Indeed, Reazuddin avers that the vehicle was intended to be a gift for Husain, indicating that the vehicle was not a necessity and that there was certainly more bargaining power in the transaction than Reazuddin acknowledges today.

¶ 64    Next, Reazuddin's affidavit described the situation as "aggressive" and "pushy" but also reveals that he left the dealership at least once during his time there. In fact, it was only when Khan

offered a substantial discount for a vehicle, estimated to be about $100,000 in value, that Reazuddin returned to the dealership, indicating that he had some kind of bargaining power within the transaction. Additionally, even though Reazuddin averred that he felt "rushed" during the transaction, his affidavit implicitly demonstrates that there could not have been any legitimate sense of urgency. Notably, the car dealership continued to be open after the transaction was completed in order for Reazuddin to acquire the cashier's checks from a bank in order to purchase the vehicle, and he was able to call the dealership around the time the vehicle broke down on the highway, at least two hours *after* he left.

¶ 65    Regarding the conversations between Khan and Reazuddin, we find nothing in the record to suggest any language barrier between the two. Additionally, although the record reflects Khan's seeming inflexibility in the transaction, we are mindful that generally, "take-it-or-leave it" approaches to sales do not necessarily rise to the level of unconscionability. See *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 15 (arbitration provisions contained within a preprinted, consumer contract form will not be found to be procedurally unconscionable "merely because a business sought to impose it through a standardized, take-it-or-leave-it contract over which the consumer had no ability to negotiate."). Although we might disagree with Khan's tactics and strategies to sell the vehicle, we cannot say that Reazuddin was placed in a situation where, as he describes, "he felt he had no choice." See also *Wigginton v. Dell, Inc.*, 382 Ill. App. 3d 1189, 1194 (2008) ("[U]nder Illinois law, a contract or provision may involve some degree of procedural unconscionability, but that may not be sufficient to render it unenforceable."). Ultimately, this was a voluntary purchase of a high-priced good, and the circumstances of the transaction lead us to the conclusion that there was no evidence of procedural unconscionability in the record before the

circuit court that would prevent the matter from being referred to arbitration. As such, we affirm the circuit court's finding on the issue of procedural unconscionability.

¶ 66                    2. Whether the Arbitration Provisions were Fraudulently Induced

¶ 67    Finally, Reazuddin contends that the circuit court erred in finding that there was no evidence of fraudulent inducement as to the arbitration provisions. Reazuddin argues that Khan's "false promises" ultimately induced him to agree to the arbitration provisions, and the trial court's reliance on *Coe*, in determining that the issue of fraud was a matter best resolved by the arbitrator rather than the trial court, was misplaced.

¶ 68    We first examine *Coe*.[4] There, plaintiffs retained the defendants, one of them a consulting company, to provide advice on how to limit their tax liability resulting from the plaintiffs' sale of their majority ownership in a business. *Coe*, 2015 IL App (1st) 142215, ¶ 3. The parties' consulting agreement included an arbitration provision for any "dispute, controversy or claim arisi[ng] in connection with the performance or breach of the agreement." *Id.* ¶ 6. The plaintiffs also signed a tax services agreement that contained the same arbitration clause. *Id.* The plaintiffs subsequently employed the defendants' recommended tax strategy and was audited by the IRS, which determined that the plaintiffs had utilized an "illegal and abusive tax shelter." *Id.* ¶ 8.

¶ 69    The plaintiffs filed suit against the defendants, alleging that defendants had "conspired to design, market, sell and implement investment strategies it knew the IRS would disallow" and that the defendants "made these representations to convince the [plaintiffs] to enter into the consulting agreement." *Id.* The plaintiffs further alleged that, by relying on the defendants'

---

[4] While *Coe* examined the validity of an arbitration agreement pursuant to federal law as the relevant contract involved interstate commerce, its disposition would have been the same under both federal and state law. 2015 IL App (1st) 142215, ¶ 18.

misrepresentations, the plaintiffs executed the agreement and then suffered damages as a result of having settled with the IRS. *Id.* Further, the complaint sought a declaration that the arbitration provisions in the consulting agreements were null and void because they had been fraudulently induced. *Id.* ¶ 9. On defendants' motion, the case was stayed pursuant to the Federal Arbitration Act.

¶ 70 On appeal, the plaintiffs argued that the trial court erred in granting the motion to stay because the arbitration provisions were unenforceable as they were part of the defendants' conspiracy to commit fraud, and the trial court should have considered the arbitration provision if it was alleged that the provision had been fraudulently induced. *Id.* ¶ 14. The *Coe* court reviewed relevant federal arbitration law, and observed that, regardless of whether a challenge to a contract was brought in federal or state court, any challenge to the validity of the contract *as a whole*, and not specifically to the arbitration clause, must go to the arbitrator. *Id.* ¶ 18 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 526 U.S. 440, 449 (2006)).

¶ 71 With these principles in mind, the *Coe* court examined the plaintiffs' complaint, which alleged fraud in the making of the agreement as a whole. *Id.* ¶ 19. The court noted that the complaint primarily alleged fraudulent inducement as to the entire contract, which was an issue reserved for the arbitrator, and not the trial court. *Id.* Although the *Coe* court acknowledged that the plaintiffs' complaint also alleged that the arbitration agreements were null and void based on fraud or fraudulent inducement, the *Coe* court held that a party alleging fraud must allege that it would have "never intended to agree to arbitrate the issues raised in the proceedings or that its assent to the agreement to arbitrate was the product of wrongful coercion," which it had not done there. *Id.* ¶ 20 (citing *Ragan v. AT&T Corp.*, 355 Ill. App. 3d 1143, 1158 (2005)). Accordingly,

the *Coe* court affirmed the trial court's holding that the complaint alleged fraud as to the whole contract, which was an issue to be adjudicated by an arbitrator.

¶ 72    Here, the record shows that the circuit court expressly relied on *Coe* when ruling on the issue of substantive unconscionability, an issue that is not before us today. However, *Coe* was also discussed by the circuit court in an exchange with defense counsel regarding the issue of fraudulent inducement:

"[DEFENSE COUNSEL]: First, that argument is really for the arbitrator to decide because *** according to the *Coe* case *** if a claim is made relating to fraudulent inducement as to a contract in total, which is the allegation here—I was fraudulently induced into signing the purchase agreement and the purchase agreement has an arbitration clause, then that claim or dispute as to the arbitrability is for the arbitrator to decide[,] so the Court's analysis ends there. Even if the Court were to consider—

THE COURT: Let me just jump in for a moment on the *Coe* case ***. In *Coe*—you correctly state what the appellate court held. But in *Coe*, they looked at whether there were any allegations relating to fraud in the inducement with respect to the arbitration clause specifically. In this case, the complaint alleges, which I have to assume to be true for purposes of this motion, that the plaintiff *** asked Mr. Khan specifically about the arbitration clause and that Mr. Khan said things that the plaintiff alleges were not true about the arbitration clause itself. And specifically those facts, it seemed to me, take this a little bit out of *Coe* because *Coe* said that the court can decide and should decide issues relating to fraudulent inducement to enter into the arbitration agreement, but as you point out correctly,

not where the allegations are simply fraudulent inducement to enter into the contract as a whole. *** But here it seems to me that the allegations relating specifically to the arbitration provision itself are a lot more specific than the appellate court found to exist in *Coe*."

¶ 73　We first make a brief observation regarding the circuit court's discussion of *Coe*. The circuit court commented that the complaint "alleged" that Reazuddin had asked Khan specifically about the arbitration clause and that Khan responded with representations that were not true about the arbitration clause. However, the two-count complaint does not make any allegations specifically relating to the arbitration provisions. Instead, the complaint here alleges fraud generally to the contract as a whole and is focused on Khan's alleged misrepresentations about the quality of the vehicle itself. Thus, it appears that the circuit court conflated the assertions in Reazuddin's affidavit with those contained within the complaint, which were not expressly incorporated therein. See, e.g., *Collins v. Superior Air-Ground Ambulance Service, Inc.*, 338 Ill. App. 3d 812, 817 ("***[w]hen an exhibit is attached to a complaint it becomes part of the complaint" and thus any facts alleged in an affidavit, when attached to a complaint, become part of the complaint).

¶ 74　This distinction is not without a difference. Under *Coe*, had Reazuddin specifically alleged in his *complaint* that he never would have agreed to arbitrate had he not been fraudulently induced, then perhaps his complaint would still be before the circuit court. *Coe*, 2015 IL App (1st) 142215, ¶¶ 20, 21. But Reazuddin's complaint does not specifically allege fraud only as to the arbitration provisions but rather, places the whole transaction and relevant contracts at issue. As such, and notwithstanding the court's comments, ultimately the court did not err either in its reliance or

application of *Coe* in determining that Reazuddin had not sufficiently narrowed his fraudulent inducement claim to prevent the matter from being referred to arbitration.

¶ 75    Further, even were we to consider Reazuddin's affidavit as part of the complaint, we would find no evidence of fraudulent inducement as to the arbitration provisions within the record. Fraudulent inducement is a form of common-law fraud. *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 15. A plaintiff must allege five elements to state a claim for fraudulent inducement: "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance." *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 80. As part of the claim, the plaintiff must allege that its reliance on the misrepresentation was justifiable, which is determined by what the plaintiff knew at the time as well any additional facts the plaintiff could have learned through the "exercise of ordinary prudence." *Id.*

¶ 76    Below and again before us now, Gold Coast argued that Reazuddin was still bound by the "duty to read" principles of law, which generally stand for the proposition that "[a] party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later *** complain that the contractual terms bind [them]." *Regensburger v. China Adoption Consultants, Ltd*, 138 F. 3d 1201, 1207 (7th Cir. 1998) (applying Illinois law). We agree with Gold Coast on this point. "One is under a duty to learn, or know, the contents of a written contract before he [or she] signs it, and is under a duty to determine the obligations which he [or she] undertakes by the execution of a written agreement." *Leon v. Max E. Miller & Sons, Inc.*, 23 Ill. App. 3d 694, 699 (1974). Thus, depending on the circumstances, any person who has an

opportunity to read an instrument and has not availed himself of the opportunity to do so cannot complain as to any alleged misrepresentation regarding the contents of the document. *Id.* at 699-700; see also *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d at 355, 365-66 (1995) ("A party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed [a] contract.")

¶ 77    As noted by Gold Coast, Reazuddin signed two separate agreements concerning arbitration, one within the purchase order and another stand-alone agreement that was incorporated within the purchase order. As noted prior, Reazuddin's affidavit demonstrated that he had the ability to identify and ask questions about the arbitration provision. Moreover, nothing in Khan's alleged statements evinces any fraud specifically as to the arbitration provisions. Khan's alleged statements do not distort the meaning of the arbitration provisions, which Reazuddin had the opportunity to both read and reject if he so chose. As such, we hold that the circuit court properly found no evidence of fraudulent inducement as to the arbitration provisions and affirm the circuit court's finding on this additional basis.

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we affirm the judgment of the circuit court.

¶ 80    Affirmed.